Raymond R. **WOODY**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 17965.

United States Court of Appeals
District of Columbia Circuit.

Argued April 28, 1964.

Decided April 12, 1966.

Opinions Filed Aug. 11, 1966.

Mr. Bernie R. Burrus, Washington, D. C. (appointed by this court), for appellant.

Mr. Gerald A. Messerman, Asst. U. S. Atty., with whom Messrs. Frank Q.

Nebeker and Joel D. Blackwell, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and BURGER, Circuit Judge, and submitted to McGOWAN, Circuit Judge, on the briefs and tape recordings.*

### JUDGMENT

PER CURIAM.

This case came on to be heard on the record on appeal from the United States District Court for the District of Columbia, and was argued by counsel.

ON CONSIDERATION WHEREOF, it is ordered and adjudged by this court that the judgment of the District Court appealed from in this case is reversed and this case is remanded to the District Court.

BURGER, Circuit Judge, dissents.

Opinions filed August 11, 1966

BAZELON, Chief Judge:

Appellant was convicted for the sale of narcotics solely on the basis of the uncorroborated testimony of Officer Bush, an undercover officer for the Narcotics Squad. Because of an almost four-month delay between the alleged sale and appellant's arrest we remanded the case to the District Court for a hearing on the reasonableness of the delay and its effect on appellant's presentation of his case. Following completion of that hearing, a supplemental record was filed. Upon consideration of the entire record, we hold that the delay was unreasonable under the principles established in Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965). Although Judge McGowan and I vote for reversal, our reasoning is not identical. We therefore state our views separately.

### I.

Officer Bush, who had no formal police training and had been on the force

---

* Circuit Judge Washington who became Senior Circuit Judge subsequent to argument was a member of the original division. He recused himself from the case prior to decision and did not participate therein.

only five months at the time of the alleged transaction, testified at trial that just before midnight on August 8, 1962, he was on the street talking about narcotics with a person he knew only as "Dave," who he later learned was James Porch. Dave told Bush that "Spook has some stuff." Following this conversation, the two crossed the street and both purchased narcotics from the same man. There was, however, no testimony that "Dave" pointed out or addressed the seller as "Spook." The sidewalk upon which the sale occurred was crowded with pedestrian traffic; the three men were standing in front of a restaurant that had lights on inside, but the sale took place near the curb, at some distance from the lights. The entire transaction took but a minute and a half. Officer Bush did not know the man who sold him the narcotics, but at trial recalled having previously "greeted" him "in passing," and having associated him with the nickname "Spook." Bush further testified at trial that he had "seen" the seller twice between the time of the transaction and appellant's arrest. During the remand hearing, however, Bush stated that he could not recall ever having seen the seller during this period.

When Bush returned home on the night of the transaction, he made some brief notes about the sale, including a cursory description of the seller—height, weight, coloring and mustache. Bush testified at trial that he normally recorded distinguishing physical characteristics of sellers, such as scars. His notes did not include the fact that the seller of August 8, 1962, had a two-inch facial scar. Appellant has such a scar. At trial Bush averred an independent recollection that the seller of August 8 had a scar, but failed to explain why he had not recorded this in his contemporaneous notes. Bush also stated that he had made no effort to record or remember a description of the clothing worn by the seller.

Bush's identification of appellant did not take place at a face-to-face confrontation. Over a week after the alleged sale, Bush met with his superiors to look through pictures from police files of persons with prior narcotics records. When handed the stack of photographs, Bush was expected to identify "any person that [he] knew or suspected, not only persons that [he] had purchased narcotics from." At the time that he picked appellant's picture from the file, he was "still looking for several people."

This method of identification encourages a show of certainty where none may exist. The undercover agent, new to the force and to some extent "on trial," inevitably feels under pressure to "produce." The pictures he reviews are of uncertain age and clarity. The fact that they are of persons previously convicted of narcotics offenses does not encourage caution. And since the officer is not immediately confronted with the persons he has identified, mistakes are not likely to be discovered then, much less months later at preliminary hearing or trial.

Unfortunately, counsel in this case was not free to show the jury the weakness of the identification by picture. He could not refer specifically to *that* picture without disclosing appellant's prior narcotics record to the jury. No limiting instruction could have avoided the highly prejudicial notion that, if one has previously been convicted of narcotics offenses, he must be guilty again, particularly since a "peddler is normally a user" who must therefore continue peddling to supply his habit.

It is true that at trial Bush independently identified appellant as the seller of August 8, 1962. But trial took place almost nine months after the alleged transaction, and Bush doubted whether he could have been able to testify at trial without refreshing his recollection from his notes of the transaction and stated that he was relying heavily on these notes for his testimony. On the other hand, he asserted that he could at the time of trial recognize *every* person from whom he had purchased narcotics during his undercover operations, even though he had made purchases from at

least 66 persons, between five and fourteen months before trial. Appellant was unable to test this seemingly incredible assertion by presenting Bush with photographs taken from police files because of the trial judge's ruling that any photographs used for impeachment purposes had to be contemporaneous with the alleged sale.[1]

Appellant testified at the remand hearing that he had told his counsel preparatory to trial that he was unable to recall his whereabouts on August 8, 1962. Appellant, however, did not so testify at trial; he did not take the stand, on counsel's advice, because of his prior record which had led to his identification from police pictures.

Before appellant's arrest, a woman with whom he had been living during August, 1962, and who might have been able to testify in his behalf, died. And James Porch, who Officer Bush said had witnessed the transaction but who had agreed to testify in appellant's behalf, was himself arrested for narcotics violations after appellant's arrest and before appellant's trial. He then refused to testify at appellant's trial on Fifth Amendment grounds.

## II.

The controlling principles to be applied in the present case were declared by this court in Ross v. United States, *supra*. We there recognized that despite the public interest in undercover narcotics investigations by the police,

[T]he Constitution contemplates a separate interest in fair procedures for the citizen faced with the loss of his liberty by reason of criminal charges. When interests of this nature impinge upon each other, as they have a way

of doing, they must be accommodated. A balance must be struck, if one or the other is not to be sacrificed completely. We see no inevitable necessity for such a sacrifice here. Certainly there need be none if the Police Department in pursuing the one interest is not wholly oblivious of the other.[2]

To strike this balance the court in *Ross* looked to two factors—the prejudice to the defendant stemming from the method of investigation and the reasonableness of the police conduct.

Our discussion of prejudice in *Ross* and the subsequent Narcotics Delay cases was framed primarily in terms of the ability of the accused to prepare and present a defense at trial. But the ultimate prejudice that has concerned us in these cases has been the risk of erroneous conviction attributable to the process which led to the verdict of guilt.[3] Delays prior to arrest which hinder or prevent presentation of a defense shackle our system of determining truth through the adversary process. The reliability of the verdict then depends solely upon the quality of the police identification. The more inherently unreliable the method of identification, the more the ultimate prejudice—the risk of erroneous conviction.

Since the prejudice to the accused in these cases is a function of police investigative methods, the police have the power and corresponding obligation to minimize it. The reasonableness of their conduct therefore depends on the extent to which they make an effort to reduce unnecessary risks of erroneous conviction. Such needless and unwarranted risks are created where, for example,

---

1. The trial judge thought noncontemporaneous pictures were inadmissible because

    We know in the narcotics business a man who is a peddler normally is a user, and the people, that tears things down, their physical appearance changes almost in a matter of six months time.

    This reasoning, if correct, applies equally to the picture from which the under-

cover agent identified appellant, and renders the identification of Woody by photograph even more suspect.

2. Ross v. United States, *supra*, 349 F.2d at 213.

3. See *e. g.*, Salley v. United States, 122 U.S.App.D.C. 359, 353 F.2d 897 (1965); Cannady v. United States, 122 U.S.App. D.C. 120, 121, 351 F.2d 817, 818 (1965).

the delay is unreasonably lengthy[4] or wholly unnecessary,[5] or where the police have it within their power to enhance the reliability of their method of identification without jeopardizing their undercover investigation, yet fail to do so.[6]

### III.

In the present case the length of the delay was four months, as compared with a delay in *Ross* of seven, and there is evidence that the undercover officer was effective in making new contacts during the period. Judge McGowan and I agree that a delay of four months is not so unreasonable as to warrant reversal absent special circumstances. Judge McGowan thinks that such circumstances are found here in the death of one potential witness and the unwillingness of another to testify. He does not say whether other matters here would also constitute "special circumstances." I do not decide whether the factors upon which he relies alone warrant reversal, since it also appears that appellant was substantially prejudiced by the unreliability of the process by which he was identified. This process increased substantially the risk that he would be convicted although innocent.[7] There is a haunting danger that any person chosen at random from the slum area where appellant lives would have been convicted, and sentenced to five or ten years, had his picture been selected instead of appellant's.

Moreover, the reasonableness of the delay was substantially undercut by the absence of police efforts to reduce the prejudice. This absence clearly appeared at the hearing on remand: When asked whether he later made any attempt to look for the seller of August 8, 1962, or to ascertain his whereabouts, Officer Bush answered that he did not. One of Bush's supervising officers, Officer Didone, when asked whether he considered "any potential prejudice to the defendant with respect to closing an investigation," answered that he did not. Officer Didone also stated that "the first sale doesn't need corroboration," and that the undercover officers avoid repeat sales where possible. Also illustrative of the insensitivity of the police toward the interests of appellant were the delay of over one week after sale before the identification by photograph and the failure of the undercover officer to make complete notes which might have revealed that the seller had a scar if he in fact had one.[8]

4. *E. g.,* Ross v. United States, *supra.*

5. *E. g.,* Godfrey v. United States, 123 U.S. App.D.C. 219, 385 F.2d 850, decided March 9, 1966.

6. Ross v. United States, *supra,* stressed several times the fact that the identification of the defendant was based on the uncorroborated testimony of an undercover agent who was able to testify only by constant reference to his notes. Other cases which have considered and turned on the reliability of the process by which the defendant was identified include Bey v. United States, 121 U.S.App.D.C. 337, 350 F.2d 467 (1965); Cannady v. United States, 122 U.S.App.D.C. 120, 351 F.2d 817 (1965); and Worthy v. United States, 122 U.S.App.D.C. 242, 352 F.2d 718 (1965).

 The reliability of the identification might be enhanced where it is possible for the police to, for example, enter into repeat sales with the suspect, make the identification without unnecessary delay after sale, obtain corroborating witnesses to the transaction, or assure that the undercover officer makes complete notes and confronts personally the accused at the time of arrest, instead of waiting until trial perhaps months later.

7. Officer Bush's uncorroborated testimony, although insubstantial, may have been sufficient to allow the jury to convict. But that is not the test. *Ross* fashioned a prophylactic rule of fairness designed to protect innocent people from conviction made possible by the delay attendant on undercover police investigation. The ultimate prejudice to the accused, the risk that he will be convicted although innocent, is not reflected in the evidence presented at trial. But it nevertheless exists if the accused has been unable to prepare a defense because of the delay before arrest.

8. The fact that Bush recorded in his notes that the seller of August 8 wore a mustache was an insufficient substitute for as complete a description as possible. Indeed, that this was the only facial char-

In the absence of any assurance that the police, in pursuing the interest of the public in effective enforcement of the narcotics laws, were mindful of the interest of appellant in fair procedures, the latter interest must prevail.

Reversed and remanded.

McGOWAN, Circuit Judge:

In Ross v. United States, 121 U.S.App. D.C. 233, 349 F.2d 210 (1965), this court reversed a narcotics conviction on a record which, as we noted, showed "(1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim of inability to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook." Earlier in that opinion we addressed ourselves to the conditions which must obtain before the due process claim of prejudice by reason of a purposeful delay to protect a police undercover operation may be appropriately raised. We noted that the problem was one of accommodating the public interest in effective law enforcement with the accused's interest in the fairness of the criminal procedures by which the charge against him is determined. We remarked that able counsel for appellant in that case had volunteered the view that a delay of the order of three months should give rise to no due process claim of prejudice by reason of such delay's impact upon the memory processes.

Although we did not draw any precise line in Ross, we commented that line-drawing, with all its admittedly unsatisfactory aspects, was necessary if the police were to be able to continue their undercover operations. Our reference in this context in Ross, by way of example, to a period of four months might well have been regarded by police and prosecutor as intimating that a failure to observe it would be at the peril of an entertainable claim of prejudice founded solely upon an assertion of the defendant's inability to remember what he was doing at the time of the alleged offense. Since Ross we have indicated that a delay of the order of four months fell on the side of the line where a claim of prejudice so founded would not necessitate inquiry. Worthy v. United States, 122 U.S.App.D.C. 242, 352 F.2d 718 (1965). See also Dorsey v. United States, No. 19307, decided October 18, 1965 (Mem.).

In Ross the delay of seven months rendered inquiry into prejudice inescapable. We decided that the claim of prejudice was made out in the circumstances shown by that inquiry, which essentially were that the defendant professed his inability to remember because of the lapse of time. An important difference between the cases for present purposes is that the purposeful delay here between offense and arrest [1] was four months, as compared with seven in Ross. That fact, within the concept of accommodation foreshadowed in Ross, would normally render the due process claim unavailing.

The claim of prejudice due to delay in this case was not, however, supported only by the appellant's inability to recall the day of the alleged offense, August 8,

---

acteristic noted tends to render the identification of Woody even more suspect. First, as a matter of common knowledge, many of the members of the sub-culture to which Woody belongs wear mustaches. More importantly, the fact that the seller had a mustache may have encouraged Bush's certainty when he identified Woody from a photograph which presumably showed him with a mustache. Bush had been asked to pour through a stack of pictures of men with police records, and it is conceivable that when he came upon one with a mustache and a face that looked vaguely familiar, he linked it with the seller of August 8, who he was sure had a mustache. Under these plausible assumptions, Bush's mental image of a man with a mustache may have contributed to an erroneous identification.

1. In this case, as in Ross, the filing of the complaint was followed immediately by arrest. Since it is the former which normally ends the period of undercover service, delay in arrest after complaint must find its justification elsewhere than in the need to protect the identity of the policeman operating clandestinely.

1962. There was an unchallenged showing that on that day appellant was, and had for some time been, living with an identified female. That potential witness died on November 24, 1962—two weeks before the complaint was filed against appellant and he was arrested. With that happening there was taken away from appellant what would appear to have been his most hopeful avenue of reconstructing the events of August 8.

There is, of course, no assurance that this other member of appellant's household would have been any more able than was he to recall the circumstances of August 8. But she was certainly the natural source to which he would have turned for help. The narcotics sale of which appellant was convicted is alleged to have occurred at midnight—an hour when it may be supposed that appellant would normally have been in the company of this witness. It was the purposeful delay by the police in this case which irrevocably eliminated even this slender hope; and it is not enough to rule out possible prejudice, as did the District Court, simply by a finding that no showing was made that the witness's testimony would have been helpful, or that her name was not mentioned at the trial. It is hard to see how any showing could have been made as to what her testimony would have been when she died before any charge was made against appellant.

This is an instance of potential prejudice which goes well beyond the usual protestation of inability to remember. It is the kind of circumstance which would warrant an inquiry into prejudice in a case despite the fact that the delay did not exceed four months. That inquiry was in fact made here;[2] and appellant's claim of prejudice was established by the proof of the event which would have warranted the inquiry in the first place, that is to say, the death at an advanced stage of the delay period of a witness as potentially critical to appellant's defense as was the one in question

here. The considerations of policy which warrant some latitude for deliberate delay are not compromised by putting the risk of this kind of extraordinary happening upon the party for whose benefit the accommodation is made.

There is a further unusual circumstance in this case involving the unavailability of a key defense witness. The undercover officer from the beginning said that another individual, known to him only as "Dave," was with him at the time the purchase was made on August 8, 1962; and that Dave also made a purchase on his own behalf from appellant. Counsel appointed to defend appellant in the District Court moved, on February 8, 1963, for discovery of the name of this witness. This request was opposed by the Government on the ground that he was an informant; and the court did not compel discovery. On February 21, 1963, the prosecutor wrote defense counsel a letter in which he said that he now understood that Dave was not an informant, and he supplied his true name (James Porch) and address. Appellant's counsel immediately interviewed Porch on more than one occasion. What he found out was so helpful to the defense that, on March 8, 1963, application was made for a subpoena at Government expense, and one was issued that day requiring Porch to appear at the trial as a defense witness. One week later a complaint was filed against Porch charging him with a narcotics transaction on October 15, 1962—five months before. At the trial, Porch, because of the pendency of this charge against him, was advised by his court-appointed counsel to refuse to answer questions on the ground of self-incrimination, and this is what he did when called as a witness for the defense.

At the hearing on the remand, counsel for appellant urged the relevance of these circumstances as an additional reason why the delay was prejudicial. The District Court refused to admit evidence tendered in support of this point, al-

---

2. The remand for inquiry into the due process issue was made prior to our decision in Ross.

though it permitted counsel to make a proffer, which included an affidavit from trial counsel for appellant that, in his conversations with Porch, the latter had persisted in saying that he was not present on any occasion when appellant sold narcotics to the undercover policeman, and that he would so testify at the trial. Thus it would appear that, from the time of the offense on August 8, 1962 until March 15, 1963, the date of the complaint against Porch, there was a witness claimed by the Government to have been an eye witness to the crime but who would himself have testified in direct contradiction of the undercover policeman. Had appellant been charged and arrested with reasonable promptness after August 8, 1962, it is possible that his trial might have occurred before Porch's testimony was rendered unavailable.[3]

The evidence so tendered with respect to Porch was well within the scope of the inquiry on remand. Since the death of the witness discussed above necessitates reversal, no remand need be made in order that the circumstances as to Porch may be pursued. But, since there is no reason to doubt that counsel would have made his proffer good, this incident provides reassurance that this conviction should be reversed.

BURGER, Circuit Judge (dissenting):

Although a majority of the Court agree on the disposition of this case, I think it is important to note that there is no opinion of the Court; indeed Judge McGowan and I are in agreement with respect to the basic question in the case, namely the standard to be applied in determining under what circumstances a four-month purposeful delay will preclude prosecution.

Judge Bazelon takes an entirely new and different approach, voting to reverse on the ground that the method and quality of the identification of Appellant were so doubtful as to render unreasonable even a four-month delay between the narcotics sale and Appellant's arrest. Judge McGowan votes to reverse only because he concludes that in the peculiar circumstances shown here the delay prejudiced Appellant's ability to defend himself since in the interval between the alleged offense and the arrest a friend who Appellant now[1] claims could have assisted his defense died. Judge McGowan's narrow basis for his position in this case assumes particular significance since as an author of *Ross* he affirmatively rejects Judge Bazelon's basis for reversal. I agree with Judge McGowan that the crucial question before us here is whether there was prejudice to the defendant's case, not whether the identification was inadequate. I differ with Judge McGowan's assessment of the prejudice present in this case.

The application of *Ross* to a particular case turns on three operative elements: (1) the *length* of the purposeful delay; (2) the *basis* of the identification of the defendant; and (3) the claimed *effect* of the delay in rebutting the identification, i.e., the resulting prejudice. It is the existence of a purposeful delay and a *Ross*-type identification that permits a

3 The only finding of fact made by the District Court with respect to Porch was that he had declined to testify at the trial; and this appears to be all that the court could have found from the evidence in the record, as distinct from that excluded as irrelevant. But from this meagre finding the District Court drew the legal conclusion that there was no prejudice because, even if appellant had been arrested and tried immediately, Porch would not have testified for appellant. This, said the court, would be true because the policeman had said that Porch had purchased narcotics from ap-

pellant at the same time as had the policeman, and would be in fear of self-incrimination. But the court had refused to receive evidence that Porch told appellant's counsel in February, 1963, that this had not happened, and that he would so testify if called by the defense. And it was not this alleged purchase with which Porch was eventually charged, but a sale by him said to have occurred in October, 1962.

1. No such claim was made as to this witness before trial, at trial or on appeal but only after we remanded.

lesser degree of prejudice to reverse; without those factors the narcotics defendant would be required to show substantial and specific prejudice.[2] Thus, the shorter the period of delay[3] or the better the method of identification,[4] the greater the prejudice which must be shown.

*Ross* recognized that there was a crucial need as well as a valid purpose for undercover narcotics investigations and that some purposeful delays between the offense and the arrest were inevitable. The underlying premise which led the court to upset the conviction in that case, therefore, was that the method of identification present in *Ross* need not preclude a conviction if the delay were shorter than the seven-month delay present in that case. Although it did not *decide* where the fulcrum should lie, it stated that balancing society's need for undercover investigations with the defendant's right to have a fair opportunity to defend himself would permit some period of purposeful delay which would provide the Police Department "some considerable latitude for the planning and organization of its undercover program."[5] The Court indicated, furthermore, that this balancing might well permit a four-month delay. Implicit in *Ross* was the assumption that it was directed at identifications made in a similar fashion, the frequent recurrence of which in narcotics prosecutions had been one of the motivating factors behind it.

Since the identification in the present case was made by the same method as in *Ross*, the uncorroborated testimony of the undercover agent based on contemporaneous notes, the second of the three factors remains constant, and since the delay here is three months shorter, any opinion reversing bears the heavy burden of showing greater prejudice to fall within *Ross*.

Judge Bazelon, however, does not take this course. While purporting to rely on the principles enunciated in *Ross*, he goes far beyond the holding of that or indeed any other recorded case. He pays lip service to *Ross* by saying that "a delay of four months is not so unreasonable as to warrant reversal absent special circumstances." He uses *Ross* not as authority, however, but only as a launching pad from which he spells out as "special" the kind of circumstances and factors which this court had previously considered tolerable in a delay so short as four months.

The "special" circumstances Judge Bazelon finds in the instant case are the "unreliability of the process by which [Woody] was identified" and "the absence of police efforts to reduce the prejudice." The latter is clearly not a "circumstance" of any kind. As to the claimed unreliable identification, the same agent and the same undercover investigation and the same processes are involved in this case as in *Ross*, save that here they are stronger.

Judge Bazelon, however, apparently feels that the "delay of over one week after sale before the identification by photograph" in this case is a special circumstance requiring reversal. Here the agent testified he was shown photographs by his superiors practically every day and that he identified Woody "shortly" after the sale, *within* a week or ten days. In *Ross* the record discloses the agent testified he identified Ross by photograph "a short time" after the sale. What is the difference? Moreover, the more relevant consideration would seem to be not how soon the agent identifies a suspect but how soon he is shown photographs; the very fact that he apparently examined many photographs before choosing Woody's strengthens, rather than weakens, the

2. See United States v. Ewell, 383 U.S. 116, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966).

3. See Roy v. United States, 123 U.S.App. D.C. 32, 356 F.2d 785 (1965); Worthy v. United States, 122 U.S.App.D.C. 242, 352 F.2d 718 (1965); Jackson v. United States, 122 U.S.App.D.C. 124, 351 F. 2d 821 (1965).

4. See Bey & El v. United States, 121 U.S.App.D.C. 337, 350 F.2d 467 (1965).

5. Ross v. United States, 121 U.S.App.D.C. 233, 236, 349 F.2d 210, 213 (1965).

resulting identification and shows how chimerical is the professed fear that "this method of identification encourages a show of certainty where none may exist." This is a search for *absolute perfection* in a process already hedged by countless safeguards, including trial by 12 laymen and the potent matter of cross-examining the witness to demonstrate to the jury that the identification rests on fragile grounds if such is the case.

Judge Bazelon also complains that the agent's notes for use against Woody are incomplete. But in *Ross* the agent did not make notes of a detailed description of the suspect which included clothing or scars; yet it is the absence of these details as to Woody that Judge Bazelon finds a "special circumstance" for reversal. Moreover we are left in total darkness as to how clothing worn on August 8 could be relevant in identifying a suspect in December.

Another "special circumstance" which looms large to Judge Bazelon is his inference that "the undercover agent, new to the force, and to some extent 'on trial,' inevitably feels under pressure to 'produce.' " Not a shred of evidence is cited to support his speculations. He would have us believe that identifications made by police "rookies" are unreliable *as a matter of law*. One might argue with at least equal logic—if it can be called by that name—that police "rookies" who are "on trial" are likely to be more careful, more conscientious and more precise in making notes.

There is a total absence of any special circumstances to justify Judge Bazelon's attempted extension of *Ross*, which is a case to be read restrictively since it represents the outer limit of burdens placed on the prosecution of narcotics peddlers.

No matter how short the period of necessary and purposeful delay, a defendant may prevail if he can show sufficient prejudice. In *Ross* itself the delay was thought perhaps to have caused *both* the defendant and a potentially helpful witness to forget their actions on the day of the alleged sale. Subsequent cases have reinforced *Ross* in this respect by requiring that some prejudice be shown and that purposeful delay and a *Ross*-type identification do not themselves constitute prejudice.[6] The shorter the period of delay, the more is the prejudice which must be shown.[7] When it reduces the period of purposeful delay, society has contributed to the balancing of interests; the more it sacrifices, the greater must be the defendant's prejudice as a result of what purposeful delay there is to prevent conviction.

Judge McGowan and I seem to be in accord on this aspect but we diverge on the quantum of prejudice present in this case as a result of the four-month delay. It is Judge McGowan's primary position that the death of the woman with whom Appellant said he had been living in the summer of 1962 requires reversal. I disagree.

Appellant was accused of making a sale on August 8, 1962. He was arrested on December 5, 1962. The woman (Mrs. Blocker) died on November 24, 1962. Judge McGowan seems to lean on the fact that the death occurred in the later stages of the delay, thus implying that if Appellant had been arrested *before* the lady's death on, for example, November 1, her absence either would have been less prejudicial to the defense or the prejudice less related to the delay. The former is obviously speculative. If Appellant had been arrested on November 1, and assuming his arrest had enabled Mrs. Blocker to reconstruct successfully the events of midnight August 8, she would nevertheless not have been available for trial, for by that time she would

6. See Jackson v. United States, 122 U.S. App.D.C. 124, 351 F.2d 821 (1965); Cannady v. United States, 122 U.S.App. D.C. 120, 351 F.2d 817 (1965); Mackey

v. United States, 122 U.S.App.D.C. 97, 351 F.2d 794 (1965).

7. *Supra*, p. 220.

have been dead.[8] The implication that the time of the death is related in some way causally to the delay is completely untenable; there is no nexus between the delay and the death, except the totally irrelevant factor that the death happened to occur in the latter stages of the delay.

Mrs. Blocker died three and a half months after the sale; Appellant's case could not have been reached for trial in that period. Even if he had been arrested *the day after* the sale, Appellant would not have had the "benefit" of Mrs. Blocker's testimony.

Furthermore, even if Mrs. Blocker had been available, there is not a scintilla of evidence to suggest that her testimony would have helped Appellant. Judge McGowan himself realizes that the lady represented at best a "slender hope." I suggest that a conviction ought not be reversed on such slender hopes and judicial speculations. I assume his evaluation of the fragility of this hope arises from the reasonable inference that an on-and-off "familial" relationship is hardly a basis for judicially presuming a pattern of behavior that would have Appellant home at midnight watching a favorite TV program, especially since the record is barren of any supporting evidence.

If Mrs. Blocker's testimony would have been helpful, one would expect that at least her existence and absence would have been in some way noted on the record at trial. It was not until the hearing on remand that Mrs. Blocker is mentioned at all. Appellant was asked with whom he was living at the time of the sale and he gave the name of his landlady. Prodded further, he said he was living with Mrs. Blocker—"*off and on.*"[9] Despite this testimony and despite the fact that there is not a shred of testimony that Appellant would have been with Mrs. Blocker on the August 8 midnight—the time of the sale—Judge McGowan rests reversal on a belief that "we may suppose" Appellant would normally have been in her company.[10] I suggest that this record is utterly barren of anything from which "we may suppose" this critical fact that leads this court to set Woody free on the streets of Washington to peddle more narcotics. A supposition leading to a "slender hope" relating to an "off and on" lady friend simply does not warrant reversal of this conviction.[11]

I submit that reversal of this case either for Judge McGowan's reasons or Judge Bazelon's, or both combined, is but another step in the process of undermining the "slender hope" the public can have that narcotics laws will be enforced effectively.

8. Mrs. Blocker apparently died unexpectedly and suddenly as a result of a heart attack. There would have been no basis for taking her deposition. FED.R.CRIM. P. 15.

9. Emphasis added.

10. This contrasts with *Ross*, where the Appellant produced a witness with whom he had been living at the time of the offense who said he was with her every night, caring for her during pregnancy, but who could not remember the events of the day in question.

11. Nor do I find any prejudice resulting from the delay in the fact that Porch invoked the Fifth Amendment when called by Appellant. The conditions that led him to fear self-incrimination were as crucial and relevant before his arrest as after. Since Porch had been arrested by the time of trial, he had the benefit of counsel to advise him as to his rights. But, of course, it is not unusual for District Judges to appoint counsel for witnesses who are not under indictment to ensure they are aware of their rights.