UNITED STATES of America,
Appellee,

v.

Marvin FEINBERG, Appellant.

No. 186, Docket 30739.

United States Court of Appeals
Second Circuit.

Argued Nov. 18, 1966.

Decided July 31, 1967.

62

Ezra H. Friedman, Otto G. Obermaier, Asst. U. S. Attys., Robert M. Morgenthau, U. S. Atty., Southern Dist. of New York, for appellee.

Irving Anolik, Hyman Bravin, New York City, for appellant.

Before WATERMAN, MOORE and HAYS, Circuit Judges.

WATERMAN, Circuit Judge:

This is an appeal from a judgment of conviction on a jury verdict in the United States District Court for the Southern District of New York. On June 1, 1966 appellant Feinberg was convicted on two counts, the first that of knowingly transporting a stolen motor vehicle in interstate commerce in violation of 18 U.S.C. § 2312, 18 U.S.C. § 2, and the second that of conspiring to commit the substantive offense, in violation of 18 U.S.C. § 371. Appellant was sentenced to imprisonment of one year and one day on the first count and to two years probation on the second count, but remains free on bail pending the determination of this appeal.

The government case established that Feinberg and his codefendant Damsky, who pleaded guilty to the conspiracy count and testified at the trial as a government witness, were joint owners of the Riverdale Auto School and Riverdale Auto Rental, Inc., located in Bronx County, New York. Early in January 1960 they were introduced to one Frank Giampetruzzi who claimed he could provide

cars for their businesses for $1000 to $1200 each because there had been a "mix-up" in serial numbers at the automobile manufacturers' plants in Detroit. Damsky expressed interest and requested Giampetruzzi to supply them with a 1960 Lincoln Continental convertible.

During the night of January 17, 1960 such an automobile was stolen from its rightful owner who had purchased it for $5800 shortly before the theft. The next morning the car was delivered to Damsky and Feinberg by one John Newton. Feinberg prepared a bill of sale warranting the Lincoln's title free of liens and accident claims. Damsky and Newton then took this bill of sale to a nearby notary before whom Newton executed it. Damsky then registered the car in his own name, insured it and secured a $1500 personal bank loan on it, the proceeds of which were given to Feinberg. On April 22 the title to the Lincoln was transferred to the auto rental company which assumed the bank loan and paid the insurance premiums on the car. Damsky testified that they paid Giampetruzzi $1000 to $1200 for it.

A witness named Cioffi testified for the Government that he introduced himself to Feinberg as a friend of Giampetruzzi and represented himself as being in the same "business" as Giampetruzzi. He offered to supply stolen cars to appellant for $1000 each if appellant would obtain blank registration forms with counterfeit validation stamps. He testified that Feinberg did furnish 7 to 10 such forms for him by depositing them in a post office box whose combination Feinberg communicated to Cioffi, and he also testified, over objection, that after he received the counterfeit registration forms he stole and delivered to Feinberg, during April 1960, a 1959 Pontiac Bonneville convertible for the price of $100.

Cioffi and codefendant Damsky also implicated Feinberg in three additional stolen car transactions during the same period involving two 1960 Thunderbirds and a 1959 Cadillac.

In July 1960 Damsky had a document prepared by an attorney authorizing Damsky to drive the Lincoln. Feinberg executed the document in his corporate capacity. On July 14th Damsky and his wife left New York in the Lincoln and drove to Mexico City for the dual purpose of vacationing and of selling the car. He was arrested there by Mexican authorities for possession of a stolen car and was returned to FBI agents in Texas on July 25, 1960.

Appellant Feinberg testified in his own behalf. He denied any complicity in the purchase or sale of any stolen automobiles. He claimed that the price paid for the 1960 Lincoln had been $5700, not $1000 or $1200. He testified that he had purchased the 1959 Pontiac Bonneville for a fair price of $2500 or $2700. He denied participation in the three additional stolen car transactions testified to by Cioffi and Damsky and denied furnishing counterfeit registration blanks to Cioffi.

On cross-examination Feinberg was confronted with his signed handwritten statement of July 21, 1960, see fn. 7 infra, which he admitted that he had made to Detective Charles Francis of the New York City Police Department and which was inconsistent with portions of his trial testimony.

On July 21, 1960, four days before Damsky had been returned from Mexico, Detective Francis, a New York City detective, went to Feinberg's office and questioned him about the 1960 Lincoln and about the 1959 Pontiac. After being told he would be taken to headquarters "in the cuffs" Feinberg agreed to accompany Francis to the detective's office at police headquarters. On the way they first stopped at Feinberg's home to tell Mrs. Feinberg to take charge at the office, and then half-way to headquarters they stopped at a diner for coffee and cake. Arriving at headquarters the questioning continued, Francis informing Feinberg that Damsky had been arrested in Mexico and that the FBI was interested in the case. Francis did not inform Feinberg that he had a right to an attorney or to remain silent, but the record gives no indication that Feinberg was

coerced in any way or subjected to tough detention-room tactics other than Feinberg's conclusory generalized statement that while he was with Francis "there was an awful lot of talking and brow-beating and threats * * *." When requested to specify what he meant by stating that what was said or done constituted a threat, he replied, "Well, by no stretch of the imagination do I want to give the impression that it was a physical threat" but he meant that there had been "a lot of repetition." Within three hours after he had arrived at Francis's office, Feinberg prepared and executed a written statement regarding his participation in the Pontiac transaction, and later on wrote out and executed another, the one relative to his involvement with the 1960 Lincoln. Feinberg left police headquarters in custody, under arrest on a state charge for criminally receiving the Pontiac. He was admitted to bail the next morning, and a week later he was further questioned at his office by two FBI agents about the 1960 Lincoln transaction. He was indicted by New York for having criminally received the 1959 Pontiac, on October 3, 1961 was tried in Bronx County Court by the court sitting without jury, and was acquitted of the charge.

On June 14, 1965 the federal indictment in the present case was filed; trial thereon commenced on Friday, April 15, 1966, the jury returned its verdict on Tuesday, April 19, 1966, and judgment was entered and sentence pronounced on June 1, 1966.

Appellant contends upon this appeal that the delay between offense and prosecution violated his right to due process and a speedy trial guaranteed by the Fifth and Sixth Amendments respectively, thus requiring the trial judge to dismiss the indictment, or, at least, requiring the holding of a preliminary hearing to investigate the reason for the delay

so as to ascertain the resulting prejudice, if any, the delay caused appellant. He also claims that the statement which he gave to the state authorities was made under such compromising circumstances as to require the trial judge either to exclude it from evidence or at least to hold a preliminary hearing to determine whether the statement had been voluntarily made. In addition, he maintains that the admission into evidence of testimony relating to an offense for which he had been previously tried and acquitted by state authorities subjected him to double jeopardy in violation of the Fifth Amendment and contravened the principle of collateral estoppel. Finally, appellant questions the propriety of the trial court's charge to the jury and the sufficiency of the evidence to support his conviction. We have thoroughly examined all of these contentions and conclude that none of them require a reversal of the judgment below.

### 1. The Pre-Prosecution Delay

The offense of which appellant has been convicted of having committed was consummated between July 14 and July 22, 1960—the period in which Damsky drove the Lincoln Continental to Mexico. Appellant, however, was not indicted until June 14, 1965, some four years and eleven months after the offense and only one month before the expiration of the applicable statute of limitations. (18 U.S.C. § 3282). Where there has been a pre-arrest delay the statute of limitations is "usually considered the primary guarantee against bringing overly stale criminal charges," United States v. Ewell, 383 U.S. 116, 122, 86 S.Ct. 773, 15 L.Ed.2d 627 (1966). Pre-arrest delay is usually free of the sometimes damaging effects of excessive post-arrest delay [1] for until he has been arrested one has not been deprived of his freedom or been publicly accused. Moreover, there may be valid justification for a pre-arrest delay. Time-

1. As was said in United States v. Ewell, supra at 120, 86 S.Ct. at 776, the Sixth Amendment guarantee "is an important safeguard to prevent undue and oppressive incarceration prior to trial, to mini-

mize anxiety and concern accompanying public accusation and to limit the possibilities that long delay will impair the ability of an accused to defend himself."

consuming investigation prior to an arrest minimizes the likelihood of accusing innocent parties and may facilitate the exposure of additional guilty persons. Once probable cause is established and an indictment filed, however, these justifications are of decreasing importance; the accusation has already been made, the prosecution has gathered at least a modicum of evidence, and news of the arrest will cause other implicated parties to take cover.[2] Also, at this point, the protection afforded by the statute of limitations expires because the statute of limitations only applies to a delay between the commission of the crime and the filing of the indictment. For these reasons a number of courts have held the constitutional shelter of the Sixth Amendment available only to those affected by post-arrest delay. See, e. g., Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963); Harlow v. United States, 301 F.2d 361 (5 Cir.), cert. denied, 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962); Parker v. United States, 252 F.2d 680 (6 Cir.), cert. denied, 356 U.S. 964, 78 S.Ct. 1003, 2 L.Ed.2d 1071 (1958); Foley v. United States, 290 F.2d 562 (8 Cir.), cert. denied, 368 U.S. 888, 82 S.Ct. 139, 7 L.Ed.2d 88 (1961); Venus v. United States, 287 F.2d 304 (9 Cir. 1960), rev'd on other grounds, 368 U.S. 345, 82 S.Ct. 384, 7 L.Ed.2d 341 (1961). But see United States v. Dickerson, 347 F.2d 783, 784 (2 Cir. 1965); United States v. Simmons, 338 F.2d 804, 806 (2 Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352 (1965).

■ Appellant argues that we must presume that he has been prejudiced by the four year and eleven month pre-arrest delay between event and indictment. But the only lapse of time *prior to arrest*[3] which will activate such a pre-sumption is that established by the statute of limitations. Indeed, some courts have said that the statute controls irrespective of whether there has been demonstrable prejudice. See, e. g., Bruce v. United States, 351 F.2d 318, 320 (5 Cir. 1965), cert. denied, 384 U.S. 921, 86 S.Ct. 1370, 16 L.Ed.2d 441 (1966); Hoopengarner v. United States, 270 F.2d 465, 469 (6 Cir. 1959); Harlow v. United States, supra at 366. In any case, it is clear that mere delay in arrest does not of itself amount to a constitutional violation. United States v. Simmons, supra, 338 F.2d at 806.

■■ Though prejudice is not to be presumed, it may well be that pre-arrest delay may impair the capacity of the accused to prepare his defense, and, if so, such impairment may raise a due process claim under the Fifth Amendment, see Powell v. United States, 122 U.S.App. D.C. 229, 352 F.2d 705, 707 (1965), or a Sixth Amendment claim based upon the speedy trial guarantee, see United States v. Simmons, supra, 338 F.2d at 806; United States v. Dickerson, supra, 347 F.2d at 784. See also Chapman v. United States, 376 F.2d 705 (2 Cir. 1967). For this reason we must inquire whether there is a plausible claim of prejudice resulting from the delay in arrest. See Jackson v. United States, 122 U.S.App.D.C. 124, 351 F.2d 821, 823 (1965). Such a claim may arise if a key defense witness or valuable evidence is lost, see Petition of Provoo, D.C., 17 F. R.D. 183, 203 (D.Md.), aff'd per curiam, 350 U.S. 857, 76 S.Ct. 101, 100 L.Ed. 761 (1955), if the defendant is unable credibly to reconstruct the events of the day of the offense, see Jackson v. United States, supra, 351 F.2d at 823, or if the personal recollections of the government or defense witnesses are impaired, Ross

---

**2.** The familiar example is found in narcotics investigations where the efficacy of an undercover agent or informant to penetrate the network of illicit distribution ceases when he publicly appears as complainant. See, e. g., United States v. Simmons, 338 F.2d 804 (2 Cir. 1964), cert. denied, 380 U.S. 983, 85 S.Ct. 1352, 14 L.Ed.2d 276 (1965).

**3.** Though there may be a presumption of prejudice where there has been shown to have been an excessive *post*-arrest delay. United States v. Lustman, 258 F.2d 475, 478 (2 Cir.), cert. denied, 358 U.S. 880, 79 S.Ct. 118, 3 L.Ed.2d 109 (1958).

v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210, 213–214 (1965), because if any of these events occur the reliability of the proceedings for the purpose of determining guilt becomes suspect.

■ In *Ross* the District of Columbia Circuit reversed a narcotics conviction though the pre-arrest delay was only seven months, because the accused was an uneducated, unemployed man without notice of the offense and with little ability or reason to recall the events of the day of the alleged offense; defendant's alibi witness was similarly unable to recall; and the sole prosecution witness testified, not from personal recollection, but only with the aid of his official notebook, the sole means of identification and prosecution of dozens of alleged narcotics offenders.[4] See also Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 (1966), Godfrey v. United States, 123 U.S.App.D.C. 219, 358 F.2d 850 (1966), decided on the authority of *Ross*. By contrast, in the instant case, Feinberg, though given every opportunity to demonstrate prejudice, was able only to point to isolated instances of diminished recall, notably when confronted with his prior inconsistent statements to state authorities; none of these instances dealt with essential matters in dispute. He, an educated, middle-aged businessman, was able to testify with specificity as to the events in question and unequivocally to deny his complicity in the criminal transaction. The extent of any damage appellant might have suffered through the delay here is mitigated by the fact that defend-

ant was placed on notice on July 21, 1960, one week after the completion of the offense, by a state official, during the course of the interview which resulted in appellant's formal statement, that he would be called to answer for his participation in the transaction; and this interview was followed within a few weeks by a similar visit from federal agents. Moreover recollection by appellant and Damsky of the transaction here involved was facilitated by various documents in evidence, i. e., the bill of sale, registration certificate, bank loan application, etc., refreshers of recollection not available in customary narcotics transactions. We note, finally, that here two prosecution witnesses were able to testify to their personal recollections of Feinberg's complicity; their lapses of memory were minor and related to non-essential details; in any event, as they were government witnesses, even these lapses, if their credibility were affected thereby, would prejudice the Government rather than Feinberg. True, while requiring the accused affirmatively to demonstrate prejudice, we must be watchfully aware of holding that the accused does not affirmatively demonstrate prejudice when "His failure of memory and his inability to reconstruct what he did not remember virtually precluded his showing in what respects his defense might have been more successful if the delay had been shorter." Ross v. United States, supra, 349 F.2d at 215. Such a handicap will usually be disclosed by a careful scrutiny of the record,[5] and certainly the record discloses none here.

4. In *Ross* the court stated, supra at 216: "Without attempting to define the precise reach of the Fifth Amendment in this context, a due regard for our supervisory responsibility for criminal proceedings in this jurisdiction requires, in our view, the reversal of this conviction." Therefore, when in United States v. Sanchez, 361 F.2d 824, 825 (2 Cir. 1966) we discussed *Ross* we considered that the result reached there was, at least in part, the exercise of the District of Columbia's supervisory power over the Metropolitan D. C. police force.

5. There were but three trial days, though a weekend intervened between the first and second days. Feinberg took the stand on Friday, and testified throughout Monday and into Tuesday. It was not until confronted—during cross-examination on Monday—with his July 21, 1960 statement that he indicated a failure to remember any circumstances that were in any way material. A study of the record discloses that the jury could well believe this failure at this time to have been feigned, for on redirect examination Feinberg detailed precisely all the events of July 21 and of the following morning, July 22, beginning with Detective Fran-

We need not consider whether it was advisable for the trial judge to have denied appellant's request for a preliminary hearing on the issue of prejudice, for, as the Government suggests, a formal hearing in this case could have revealed no more than did the trial record. Where, unlike here, a substantiation of a claim of prejudice involves additional witnesses whose testimony would be irrelevant to the issue of guilt and would tend only to confuse or prejudice the jury trying that issue, a hearing in the jury's absence may be in order. · This case presents no such problem.

 Inasmuch as we have observed that there is an absence of prejudice shown by this record, the remaining issue for our resolution is whether a delay in arrest, however unjustifiable or unnecessary, is sufficient to invalidate a conviction where the defendant has not shown that he was prejudiced by the delay. We hold that it is not, for "[T]he Constitution and Rule 48(b) protect only against *unreasonable and unnecessary* delay * * *." (Emphasis added.) United States v. Simmons, supra 338 F.2d 804, at 806; see Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705, 708 (1965). No case has been found holding a deliberate, unnecessary pre-arrest delay sufficient basis for reversal unless it also became unreasonable and oppressive by reason of prejudice to the accused. The language in Pollard v. United States, 352 U.S. 354, 361–362, 77 S.Ct. 481, 1 L.Ed.2d 393 (1957) and Petition of Provoo, 17 F.R.D. 183, 203 (D.Md.), aff'd per curiam, 350 U.S. 857, 76 S.Ct. 101 (1955), referred to by appellant, must be read in the context of post-arrest delay problems which, as we have already indicated, involve greater dangers to defendants.

Nor is our recent per curiam decision in United States v. Sanchez, supra, to the contrary. Although that opinion contains dicta which might be construed as supporting appellant's position, we affirmed the refusal of the trial court to permit inquiry into the reason for a delay of thirteen and one half months in arresting a narcotics offender because "No semblance of a showing of prejudice was made * * *." 361 F.2d at 825. So, too, there is similar language in Chapman v. United States, 376 F.2d 705, 707, which must be read in light of the holding there that a claim that a pre-arrest delay reached prejudicial constitutional proportions must be raised at the commencement of a trial because both parties are then in the best position to litigate the question of prejudice. 376 F.2d 705, 707.

It would be unwise to impose upon the judiciary the inquisitorial function of scrutinizing the internal operations of law enforcement agencies when no possible prejudice to the accused has been shown. Acceptance of the proposition advanced by appellant would encourage hasty, less efficient investigation and premature deprivations of freedom, curtail the investigation of organized crime, and lodge with enforcement agents the procedural onus of recording in detail every event in the investigative process. In short, fear of forfeiting a prosecution would frequently induce *unreasonable* speed which "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself." United States v. Ewell, 383 U.S. 116, 120, 86 S.Ct. 773, 776 (1965).[6]

## II. *The Admissibility of Appellant's Statement*

 We now turn to the question of the admissibility of the handwritten

cis's call at Feinberg's office in the afternoon, his lodgement in a New York City lockup that evening, his appearance in court to answer to the state charge the following morning and the prompt obtaining of bail thereon. Even one of faulty memory, who had never before spent a night in a lockup, would be more apt to recall the events surrounding that incarceration than to recall other events

not so spectacularly unique in his experience.

6. Inasmuch as here the absence of prejudice is established we need not specifically determine when, if ever, a prosecution must fail if the defendant establishes prejudice, and the Government establishes that the delay was justified by the exigencies of the enforcement process.

statement[7] given by appellant to Detective Francis, a state investigative officer. Appellant contends that his July 21, 1960 statement regarding the Lincoln transaction was made involuntarily as he was not informed in any way of his constitutional rights prior to making the statement. Conceding the inapplicability of the guidelines established in Miranda v. State of Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) to cases tried before the date of that decision, Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966), appellant argues that Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) compels the exclusion of his statement. Since the present case was tried after June 22, 1964, the standards set forth in Escobedo are clearly applicable. Johnson v. State of New Jersey, supra. We must, then, determine the effect of those standards.

 In Escobedo, the Supreme Court held that where

* * * the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, * * * the police carry out a process of interrogations that lends itself to eliciting incriminating statements, the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent, * * * no statement elicited by the police during the interrogation may be used against him at a criminal trial. 378 U.S. at 490–491, 84 S.Ct. at 1765.

The Supreme Court has not only settled the broad implications of Escobedo in its discussion in Miranda v. State of Arizona, supra, but it would seem has also directed us to apply the precise narrow holding of Escobedo, quoted above, to persons tried, as was appellant Feinberg, during the two-year period after the Escobedo decision and before the decision in Miranda on June 13, 1966. In Johnson v. State of New Jersey, 384 U.S. 719, 733–734, 86 S.Ct. 1772 (1966), the Court indicated that uniformity of application of constitutional standards necessitated the guidelines laid down in Miranda to cover situations not presented by Escobedo.[8]

7. The statement, Government Exhibit 13, reads as follows:

7/21/60

My Partner knew this fellow from the 92 St YMCA. He had played ball with him & worked out with him quite often. Upon getting a lift from the owner of the Lincoln one nite they discussed the buying & selling of cars. My partner proclaimed interest in the Lincoln. About a month later this fellow agreed to sell it. He wanted a price that (after checking) approached wholesale figures. My partner brought him up to see me. We tried the car out & it seemed to run beautiful.

We dickered a little on price & then we bought the car after about a week. The large sum involved cautioned me to have more than just a registration. I arranged to have a sort of notarized bill of sale exchanged. I did not know of any other precautions to take as this is not a title state.

Before buying the car we took a $2000 mortgage on the car with a bank using the motor numbers. The reason that we tried to sell the car in Mexico is because my partner wanted to take a combination vacation & business trip. The car as my bills will readily attest was a definate [sic] lemon. Total price price [sic] of car was $5700.

The above statement was written by me volountarily [sic].
/s/ MARVIN FEINBERG

8. The Court stated:

As for the standards laid down one week ago in Miranda, if we were persuaded that they had been fully anticipated by the holding in Escobedo, we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines clearly foreshadowed. The disagreements among other courts concerning the implications of Escobedo, however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in Miranda, and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966.

Accordingly, we apply the precise holding of *Escobedo* here, and, in applying that precise holding, we note initially that Feinberg did not request counsel, hence he was not denied " 'the Assistance of Counsel' in violation of the Sixth Amendment * * *." Escobedo v. State of Illinois, supra 378 U.S. at 491, 84 S.Ct. at 1765. Since the requirement that there be an explicit admonition as to the constitutional rights of an accused in order to effect a waiver thereof,—see *Miranda*, 384 U.S. at 467–469, 86 S.Ct. 1602,—did not exist until *Miranda*, see Davis v. State of North Carolina, 384 U.S. 737, 740, 86 S.Ct. 1761, 16 L.Ed.2d 895 (1966),[9] the instant failure to warn is not fatal to an affirmance of the conviction. By traditional standards, Feinberg's statement was totally voluntary, thus precluding a Fifth Amendment claim, see Cicenia v. LaGay, 357 U.S. 504, 78 S.Ct. 1297, 2 L.Ed.2d 1523 (1958). Therefore we hold that there is no constitutional infirmity preventing government exhibit 13 from being admitted into evidence after it had been handed to and had been identified by the appellant during the Government's cross-examination of him.

Appellant also complains that the trial judge failed to comply with Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964) when he denied a request for a preliminary hearing to be held outside the presence of the jury on the question of the voluntariness of the statement. Here, the statement in question was admitted over objection during the cross-examination of appellant who had testified in his own defense. The trial judge refused to hold a preliminary hearing but did permit defense counsel on redirect in the presence of the jury fully to develop the circumstances under which appellant made the statement. Appellant's testimony in this particular was uncontradicted and, contrary to appellant's assertion made to us on appeal, the trial judge indicated for the record prior to submission of the case to the jury that appellant made the statement "voluntarily and free of coercion." See trial minutes pp. 382–383, Record pp. 447–48.

Jackson v. Denno sets forth that due process requires that there first must be a reliable determination of any disputed facts regarding the voluntariness of a statement by the accused and that this determination must be unaffected by the truth of the statement or the guilt of the accused. 378 U.S. at 387, 84 S.Ct. 1774. For this reason, the jury must not be left to resolve factual disputes affected by the content of the statement until the trial judge, another judge, or another jury, Jackson v. Denno, supra at 391, n. 19, 84 S.Ct. 1774, has initially found the statement to have been made voluntarily. 378 U.S. at 387, 84 S.Ct. 1774. Additional purposes served by such a preliminary hearing are those of granting the defendant an opportunity to testify in respect of his statement without being compelled to take the stand in his defense, see United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97, 96 L.Ed. 48 (1951), and of permitting appellate review of the determination as to voluntariness, see Boles v. Stevenson, 379 U.S. 43, 45, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964).

We have no doubt that the mandate of *Jackson* is applicable to the federal courts as a component of Fifth Amendment due process. Berman v. United States, 378 U.S. 530, 532, 84 S.Ct. 1895, 12 L.Ed.2d 1012 (1964) (Black, J., dissenting); Hutcherson v. United States, 122 U.S.App.D.C. 51, 351 F.2d 748, 753 (1965). It is certainly the better practice [10] for "the factual bases of

---

9. The Court observed in *Davis* that since *Miranda* was to be applied prospectively only, " * * * the present case may not be reversed solely on the ground that warnings were not given and waiver not shown." 384 U.S. at 740, 86 S.Ct. at 1764.

10. The preliminary hearing was an approved practice in this circuit even before *Jackson*. See, e. g., United States v. Aviles, 274 F.2d 179, 192, cert. denied, 362 U.S. 974, 80 S.Ct. 1057, 4 L.Ed.2d 1009 (1960); United States v. Gottfried, 165 F.2d 360, 367, cert. denied, 333 U.S. 860, 68 S.Ct. 738, 92 L.Ed. 1139

a voluntariness objection * * * to be first explored out of the presence of the jury, with opportunity to both sides to give their versions, unless it is clear that the objection is wholly frivolous." Luck v. United States, 121 U.S.App.D.C. 151, 348 F.2d 763, 766 (1965).[11] Here the trial judge ran the risk of reversible error by permitting the statement to be read to the jury prior to any exploration of the surrounding circumstances. See Tooisgah v. United States, 137 F.2d 713, 716 (10 Cir. 1943). If appellant's subsequent testimony had indicated a credible possibility that his written statement, footnote 7 supra, had been unconstitutionally coerced, it would seem that a declaration of a mistrial would have been required in order to avoid the injustice denounced by *Jackson*.

In the present case, however, no harm resulted to Feinberg by reason of the trial judge's failure to hold a preliminary hearing or to make specific findings as to voluntariness. Appellant had the benefit of a full factual hearing on his claim of involuntariness without prejudice to his privilege to refuse to testify before the jury in his own behalf because he had independently chosen to take the stand. Had a formal hearing outside the presence of the jury been held, the undisputed facts gleaned from appellant's testimony would have necessitated a finding by the trial judge of voluntariness and a submission of the statement to the jury. Unlike *Jackson*, the essential facts are here undisputed, and the trial judge could find voluntariness as a matter of law, Butler v. United States, 122 U.S.App.D.C. 5, 350 F.2d 788, 789 n. 1 (1965), cert. denied, sub nom. Greenwell v. United States, 384 U.S. 992, 86 S.Ct. 1899, 16 L.Ed.2d 1009 (1966). Moreover, unlike Boles v. Stevenson, 379 U.S. 43, 85 S.Ct. 174, 13 L.Ed.2d 109 (1964), and see Curtis v. United States, 121 U.S.App.D.C. 283, 349 F.2d 718 (1965); Green v. United States, 122 U.S. App.D.C. 33, 351 F.2d 198 (1965), the independent judicial determination and findings prerequisite to effective appellate review are here "clearly evident" or "ascertainable" from the record. See Jackson v. Denno, 378 U.S. 368, 378–379, 84 S.Ct. 1774 (1964). Nor does it appear that the trial judge in determining the voluntary nature of the statement was excessively influenced by its truth, as in Hutcherson v. United States, supra, or by a desire to avoid a mistrial, see Luck v. United States, supra 348 F.2d at 765–66, for here the undisputed facts clearly demonstrate voluntariness.

It is apparent that no end of justice would be served by a slavish adherence to the rule requiring a preliminary hearing. See Tooisgah v. United States, supra 137 F.2d at 716; Williams v. Anderson, 362 F.2d 1011 (3 Cir. 1966). If the rule required us to remand, appellant would be entitled first upon remand not

---

(1948). After *Jackson* was decided the Fourth Circuit instructed its trial courts that, in cases where the voluntariness of a defendant's statement is questioned, a preliminary hearing should be held away from the presence of the jury so that the accused can testify and be cross-examined solely with reference to whether his statement was coerced. The trial court should then make explicit findings of fact and, if it is determined that the statement was voluntary beyond a reasonable doubt, the statement should be submitted to the jury together with a repetition of the relevant testimony concerning the claimed coercion, the jury to be instructed that they are not to consider the contents of the statement as bearing upon the issue of defendant's guilt unless they find the statement to have been a voluntary one beyond a reasonable doubt. United States v. Inman, 352 F.2d 954, 956 (4 Cir. 1965). This is essentially the same procedure adopted for the courts of New York by the New York Court of Appeals in People v. Huntley, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965).

11. A claim cannot be found frivolous by briefly questioning the interrogating officers prior to hearing defendant's version. Luck v. United States, 121 U.S. App.D.C. 151, 348 F.2d 763, 765–66 n. 2 (1965). Following United States v. Carignan, 342 U.S. 36, 72 S.Ct. 97 (1951), it would seem essential that an accused have an opportunity to recite the relevant facts, outside the presence of the jury, before the trial judge dismisses his claim as frivolous.

to a new trial but only to an "independent judicial determination" on the issue of voluntariness, Jackson v. Denno, supra, 378 U.S. at 394, 84 S.Ct. 1774 (1964) and this determination he has already received. Thus we find no reversible error in the admission of the statement into evidence, or in the procedure the trial court adopted in testing and determining its admissibility.

### III. The Admissibility of Cioffi's Testimony

At trial Joseph Cioffi testified concerning appellant's participation in the purchase and registration of a stolen Pontiac in April 1960. This testimony was introduced to prove that appellant had guilty knowledge as to the source of the Lincoln prior to its interstate transportation in July 1960. Appellant, as we have noted previously, had been acquitted in a New York state court of a charge that he had criminally received that Pontiac, and he argues that the introduction of this testimony subjects him to double jeopardy, or, alternatively, that the testimony relates to an issue which was determined at the state court trial and the Government is collaterally estopped from presenting it here.

The first branch of this argument may be summarily dismissed by noting that neither of the essential elements of a plea of double jeopardy, i. e., an identity of successive sovereigns, Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); United States v. Wapnick, 315 F.2d 96 (2 Cir. 1963), cert. denied, 374 U.S. 829, 83 S.Ct. 1868, 10 L.Ed.2d 1052 (1965), and an identity of alleged offenses, 2 Wharton's Criminal Evidence, §§ 650, n. 20 (1966 Supp.), 653; Williams v. United States, 179 F.2d 644, 649 (5 Cir. 1950); United States v. Kramer, 289 F.2d 909, 913 (2 Cir. 1961), are present here. A former acquittal upon one charge is no bar to the presentation in a subsequent prosecution for a different offense of facts relevant to prove that the defendant committed the latter offense. Pilcher v. United States, 113 F. 248, 249 (5 Cir.1902).

While the doctrine of collateral estoppel is indeed applicable to criminal cases, Sealfon v. United States, 332 U.S. 575, 578, 68 S.Ct. 237, 92 L.Ed. 180 (1948), the party estopped from relitigating the same issues must have been a party to the initial litigation. Serio v. United States, 203 F.2d 576, 578 (5 Cir.1953); United States v. Wapnick, 198 F.Supp. 359, 360 (EDNY 1961), aff'd per curiam, 315 F.2d 96 (2 Cir.1963), cert. denied, 374 U.S. 829, 83 S.Ct. 1868 (1965); United States v. Kramer, supra 289 F.2d at 913. There is insufficient identity of interest between the state and federal governments in prosecuting intrastate and interstate offenses, respectively, United States v. Sutton, 245 F.Supp. 357, 359–360 (D.Md.1965), to warrant treating the Government here as a party, or even as privy, to appellant's initial litigation which resulted in the prior acquittal in the state court.

Moreover, even if we were to treat the Government as a party to the first prosecution the appellant, in order to sustain his claim, must show that the facts related by Cioffi which he sought to exclude from the second trial must have been "necessarily determined" by the verdict of acquittal in the first trial. Adams v. United States, 287 F.2d 701, 705 (5 Cir. 1961). On this record we cannot ascertain the basis for appellant's former acquittal or the extent of Cioffi's testimony at that trial. Inasmuch as appellant here, in claiming an estoppel, has the burden of proving that the testified-to facts sought to be excluded at the trial below were actually concluded by the prior state court acquittal, Moore v. United States, 120 U.S.App.D.C. 173, 344 F.2d 558, 560 (1965); United States v. International Building Co., 345 U.S. 502, 506, 73 S.Ct. 807, 97 L.Ed. 1182 (1953), and has failed to carry his burden, his claim that the trial court erred in this particular is of no avail to him.

We have examined appellant's remaining contentions, including his claims that the trial court's charge did not adequately protect him and that the

evidence was insufficient to support his conviction. We find them all to be devoid of merit.

The judgment below is affirmed.

HAYS, Circuit Judge:
I concur in the result.