Clyde L. **HARDY** and Lee Roy Ferguson, Appellants,

v.

**UNITED STATES** of America, Appellee.

No. 20183.

United States Court of Appeals District of Columbia Circuit.

Argued Sept. 14, 1966.

Decided June 19, 1967.

Petition for Rehearing En Banc Denied Oct. 4, 1967.

Mr. Carl V. Lyon, Washington, D. C. (appointed by this court), with whom Mr. Edward G. Howard, Washington, D. C., was on the brief, for appellants.

Mr. Charles A. Mays, Asst. U. S. Atty., with whom Messrs. David G. Bress, U. S. Atty., Frank Q. Nebeker and Earl J. Silbert, Asst. U. S. Attys., were on the brief, for appellee.

Before BAZELON, Chief Judge, and FAHY* and TAMM, Circuit Judges.

TAMM, Circuit Judge.

This court is again asked to reverse the narcotics laws convictions of these two appellants. This sought after relief is denied.

These appellants were convicted by a jury on a multiple count indictment charging violations of the narcotics laws in a trial conducted by a judge of this court sitting pursuant to 28 U.S.C. § 291(c) (1949), *as amended,* (Supp. I, 1966), as a District Court judge. They appealed to this court, alleging as a ground for their appeal that their right to a fair trial had been violated by a delay of approximately seven and one-half months between the time of the offenses with which they were charged and their arrests.

On August 20, 1964, a duly constituted panel of this court affirmed their convictions, Hardy & (Ferguson) v. United States, 119 U.S.App.D.C. 364, 343 F. 2d 233. That panel, in its carefully considered opinion, concluded that "[t]he delay between alleged act and arrest was not oppressive and the delay between arrest and trial did not violate appellants' Sixth Amendment rights. Smith v. United States, 1964, 118 U.S.App.D.C. 38, 331 F.2d 784 (en banc); Nickens v. United States, 116 U.S.App.D.C. 338, 323 F.2d 808 (1963)." Subsequently, all of the judges of this court considered the appellants' contentions on this point, and on December 18, 1964, denied appellants' petitions for rehearing. Certiorari was denied by the Supreme Court on April 26, 1966, 380 U.S. 984, 85 S.Ct. 1353, 14 L.Ed.2d 276. Normally and logically this should have terminated the appellate procedure available to these appellants upon the point raised and considered in their initial direct appeal. In June of 1965, however, we considered the case of Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210. In that case, the appellant's narcotics conviction was reversed. The court, after balancing the interests presented on the record, decided to order a new trial in exercise of

* Circuit Judge Fahy became Senior Circuit Judge on April 13, 1967.

"our supervisory responsibility." [1] That was because Ross had not been arrested until after a purposeful seven months delay following the date when, as an undercover police officer testified without corroboration, he had purchased narcotics from the accused. The panel of this court which considered *Ross* affirmatively compared it with our earlier opinion involving our present appellants and readily distinguished the *Ross* case from that of the present appellants by setting forth in footnote 4 of the cited *Ross* opinion that *"Hardy* did not involve the wholly uncorroborated testimony of an undercover policeman; a paid police informer, who claimed to have been an eyewitness to the sale, testified in support of the Government."

On January 4, 1966, our appellants here filed a motion in the United States District Court pursuant to section 2255 [2] requesting the District Court to vacate and set aside their sentences, again asserting that their sentences were illegal because of an unreasonable delay between their offenses and arrests—which was the ground for their initial appeal to this court—and placing reliance upon our holding in Ross v. United States, *supra,* which opinion had, as noted above, been rendered subsequent to the original convictions and appeals. Again, the judge of this court who had originally conducted the trial of the appellants considered their motion and denied it, stating, " * * * on a full evidentiary record, with the issue of delay in prosecution fully raised, the Court of Appeals affirmed the convictions. Under the circumstances, the motion and the files and records of this case show that the motion must be denied." Our present appeal stems from that denial.

■ The appellants are currently barred from collaterally attacking their convictions, because the precise issue now raised was fully raised on their direct appeals and disposed of adversely to them. It has been repeatedly held that issues disposed of on appeal from the original judgment of conviction will not be reviewed again under section 2255. Lampe v. United States, 110 U.S.App.D.C. 69, 288 F.2d 881 (1961), cert. denied, 368 U.S. 958, 82 S.Ct. 400, 7 L.Ed.2d 389 (1962); McGuinn v. United States, 99 U.S.App.D.C. 286, 239 F.2d 449 (1955), cert. denied, 353 U.S. 942, 77 S.Ct. 818, 1 L.Ed.2d 762 (1957); VanBuskirk v. United States, 343 F.2d 158 (6th Cir. 1965); Sykes v. United States, 341 F.2d 104 (8th Cir. 1965); Frye v. United States, 337 F.2d 385 (7th Cir. 1964), cert. denied, 380 U.S. 925, 85 S.Ct. 927, 13 L.Ed.2d 810 (1965). This point in itself should be completely dispositive of the appeal in this case, but my learned brother by his dissenting opinion brings into this case factors which require further comment.

Basically, the dissenting opinion proposes that the present panel of this court overrule the prior panel which heard and disposed of the appeal of these appellants on its merit. Obviously, no panel of the court has any right whatsoever to overrule the holdings of another panel of the court. To engage in this process is to bring chaos to the court's rulings. Were the court to follow this procedure, the decisions of each panel would be valid only on the day of the issuance, and the resulting confusion would obviously destroy the entire value of appellate proceedings.

In addition, however, the dissenting opinion suggests that our present panel surmise that the panel which decided the *Ross* case, *supra,* did not mean what it said when it, in turn, was interpreting the facts in the *Hardy* case.

Another aspect of the dissenting opinion which causes me concern is that it is

1. "Without attempting to define the precise reach of the Fifth Amendment in this context, a due regard for our supervisory responsibility for criminal proceedings in this jurisdiction, requires in our view, the

reversal of this conviction." *Ross, supra,* 121 U.S.App.D.C. at 239, 349 F.2d at 216.

2. 28 U.S.C. § 2255 (1959).

predicated upon that writer's rejection of the trial jury's evaluation of the credibility of witnesses and formulates judicial policy upon the basis of the appellate judge's own evaluation of that testimony. Without having seen or heard the testimony of the witnesses, the dissenting judge concludes that some of the testimony has "questionable significance." Indicative of the reliance upon surmise utilized to strengthen the dissenting opinion is the repetitive use of selected conclusionary phrases describing the evidence in the case as "covered with haze," "apparently * * * not even clear," "hectic," etc. The dissenting opinion states that "probably" the police officer's service on the street "was a very strained and tense period—a clandestine life made more oppressive by constant fear of exposure and perhaps death." He would then frankly overrule the jury's on-the-scene evaluation of the credibility of the police officer and the informer and remand for a further hearing on the question of delay. Finally, he concludes by saying that his "confidence * * * is shattered by other facets of this case which indicate that the police took only scanty precautions to insure that they picked the right defendants", etc.

Words are completely inadequate to emphasize the error of predicating appellate judicial action upon this kind of second-guessing of a jury.

Troublesome also is a further collateral problem underlined by the action proposed in the opinion of my dissenting brother. Although this court has gone far beyond the limits of many other appellate courts in assuring to appellants in criminal cases complete and exacting reviews of their convictions, there must— as a matter not only of logic but of sound judicial administration—be some point of termination in the appellate procedure. Were this panel to ignore all judicial precedent and overrule not one but two prior panels of the court, it would, in effect, be by judicial fiat extending the ever-lengthening processes which constitute Perpetual Appeals. It is popular now to publicly decry the huge backlog of criminal cases awaiting trial in our District Court, and yet the procedure proposed in the dissenting opinion would add to the burden of our trial court the necessity for conducting further hearings in this case and, I suppose, similar cases. True it is, that this court's basic responsibility is from time to time to remand individual cases to the District Court for further proceedings. These remands, as a matter of law, of sound judicial administration, and of simple efficiency, should be confined to those meritorious cases in which there exists some unresolved substantial question of law or fact. The questions of law and fact raised by the appellants' present appeal have been resolved against them heretofore by a judge of this court sitting as a trial judge, by a panel of this court sitting in appellate review of the trial court proceedings, by the court considering the case en banc, by at least a basic review by the Supreme Court, as manifested by that Court's denial of certiorari, and finally by a second panel of this court in distinguishing appellants' case from that of the defendant Ross, heretofore identified. It does not require the services of efficiency experts, management surveys, or administrative studies to discover that in a case such as this the court is figuratively spinning its wheels by making no forward progress in dealing with the Judiciary's serious problems of congestion.

Affirmed.

FAHY, Circuit Judge (concurring in affirmance):

I agree with Parts I and II of Judge Bazelon's dissenting opinion. I do not think, however, that the standards of *Ross* should be applied on collateral attack in a case in which the judgment was affirmed on direct appeal before the date of the *Ross* decision. I think the proper course is for these appellants to petition the full court to reconsider its earlier denial of rehearing en banc.

BAZELON, Chief Judge (dissenting):

Hardy and Ferguson were convicted of narcotics offenses and sentenced to ten and five years respectively. Their conviction was affirmed on appeal. Hardy v. United States, 119 U.S.App.D.C. 364, 343 F.2d 233 (1964). They move now under 28 U.S.C. § 2255 to have their convictions set aside on the ground that our subsequent decision in Ross v. United States, 121 U.S.App.D.C. 233, 349 F.2d 210 (1965) should be applied to them. Since the record of their original trial indicates that these appellants were convicted contrary to the standards set forth in *Ross,* and since I think the standards of that case should be applied here, I would remand this case for a full hearing to determine whether these appellants are being held illegally. Judge Fahy agrees that the standards of *Ross* were violated but feels constrained to deny relief for the reasons discussed in his special concurring statement.

## I

On August 27, 1962, at 10:30 p. m. Private Rufus Moore and his "special employee," Atria Harris, walked north on the 1200 block of 7th Street, Northwest. They met someone walking in the opposite direction who asked them if they were looking for narcotics. Moore said yes. The three entered Moore's car and drove to the 700 block of H Street, Northeast. Special employee Harris remained in the car, and the other two walked across the street. There they met a third person who sold six capsules of heroin to Moore for nine dollars. Moore returned to his car and drove away with his special employee. The entire transaction, from the first meeting on 7th Street, Northwest to the sale of heroin on H Street, Northeast, took approximately fifteen minutes.[1]

Almost seven months later, on March 15, 1963, complaints issued charging that Hardy was the man Moore met on 7th Street, Northwest and that Ferguson was the man who sold heroin to Moore on H Street, Northeast. Ferguson was informed of the charges against him on March 20, 1963, when he was arrested. Hardy was not arrested until April 25, 1963, six weeks after the complaint was signed and eight months after the alleged crime.

At the trial, Officer Moore identified both defendants as the participants in the events of August 27, 1962. About some of these events his testimony was quite clear. But his recollection of that night came from a report he wrote on the night of the crime.[2] His independent recollection, not only about the events of August 27, but about his entire undercover operation, was covered with haze.

He could not remember how far from his car the illicit transaction took place.[3] He was unclear about whether he had engaged Hardy in conversation other than to receive driving directions.[4] He remembered that he was at the police station when Hardy was arrested, but he did not remember when that was.[5] He knew that he had identified Hardy's picture, but, as he said at the pre-trial hearing, "I can't remember the exact date— prior to March 15th, to my drawing of the warrant, sir." [6] At the trial he recovered his memory slightly. "Well, it was sometime [after the crime]. To the best of my memory, it was a month or so later when his name was found out." [7] Although the Government claimed that Hardy used the name Buddy Harris as an alias, Moore could not remember whether he had ever looked at a picture of someone named Buddy Harris.[8] Moore was relatively clear that he had never

---

1. Trial transcript (tr.) 20–21, 35–36.
2. Tr. 57–58.
3. Tr. 36–37.
4. Tr. 34–35.
5. Tr. 43.

6. Transcript of hearing on pre-trial motion (m.) 48.
7. Tr. 55.
8. Tr. 41.

seen either defendant before the crime,[9] but he was unclear about whether he had seen Hardy after the crime. "To my recollection, sir, I really can't recall. Possibly once." [10] "Sir, from the time that this purchase was made up until the 26th when he was arrested and brought before me, as I said to counsel, I possibly saw this man, I vaguely recall, once on the street somewhere, but I don't know where because at the time it wasn't of importance to me; and that is why I can't say definitely that I was even, you know, this individual; but I vaguely recall seeing him, but where, I don't know. I could have walked in a bar or a poolhall or something and he was in there. I don't recall the place." [11] He could not remember what he was doing on the 24th, 25th, or 26th of August, 1962.[12] He did not recall whether he made any purchases during July, 1962,[13] or whether the purchase from Ferguson was the first.[14] Apparently, he was not even clear about precisely how many complaints he had made. At the pre-trial hearing he thought there were 109, and at the trial he thought there were 102.[15]

These lapses in memory are perfectly understandable. Officer Moore was put onto the street two weeks after he joined the Metropolitan Police Department. Before he joined he had no special training in crime detection or narcotics practice. He had never come in contact with narcotics before.[16] During his two weeks training period, he received "briefing on laws of arrest and things of that nature." [17] It was about five weeks later that Moore bought narcotics from someone he said was Ferguson.

Moore's service on the street was hectic. At the end of his undercover period he made 102 complaints. And probably it was a very strained and tense period—a clandestine life made more oppressive by the constant fear of exposure and perhaps death.[18] But most important, the length of time between the events and the trial caused Officer Moore to recollect poorly. He was quite candid when he agreed that "the passage of time dulled [my] memory." [19] We need

---

9. Tr. 42, 48. There is some ambiguity in this regard also M. 36–37.

10. M. 41.

11. M. 48. Cross-examination on this point is revealing:

Q. Now, do you have any idea or do you recall, Officer, when this possible meeting with the defendant might have taken place?
A. I didn't say there was a meeting.
Q. Well, can you give us any idea of when you might have possibly seen him?
A. No, sir, I can't.
Q. Was it in '62, later in '62, or was it earlier in '63?
A. I don't know, sir. I can't recall. I can't say whether it was '62 or '63.
Q. I see. You don't know whether it was before or after Christmas or anything?
A. No, sir, I don't.
Q. But you have some idea in your mind that you might have seen him?
A. Possibly once, yes, sir.
Q. What gives you that idea if you have no idea when it was?
A. Well, there is a possibility that I could have seen him once, as I said before.
Q. But there must have been something to suggest that you might have

seen him once. Why did you say you might have seen him once?
A. Because I have a vague recollection of the fact that I did see him once, but where I don't know.
Q. Not where, an approximate idea of when?
A. I don't know when. That is why I said possibly once.
Q. You don't know which year?
A. No, sir, I don't.
Q. Was he locked up then, do you recall, or was he on the street or what?
A. As I said before, the possibility is that he was on the street, but I don't know where.
Q. You saw him on the street once?
A. Yes, sir. M. 43–44.

12. Tr. 48.

13. Tr. 31–32.

14. Tr. 32–33.

15. M. 34, tr. 49.

16. Tr. 27–29.

17. Tr. 29.

18. M. 56.

19. Tr. 42. See also tr. 33.

not question Officer Moore's integrity or competence to suppose that, by the time of the trial, the events of August 1962–March 1963 were not too clear in his mind.

Yet, during his entire period as an undercover agent Moore knew that he would have to recall what he saw and what he did. Ferguson did not know until almost seven months later that he would have to remember a few minute period during the night of August 27, 1962. Hardy did not know until eight months later that fifteen minutes of that night would become important to him.

Reconstruction of that night was even more difficult for these defendants because neither had a stable frame of reference. Ferguson testified that on August 27, 1962, he was addicted to narcotics and that he was unemployed.[20] He denied having sold narcotics that night, but he could not remember anything more specific.[21] Hardy also was unemployed during August of 1962.[22] He was living a nomadic existence—from tourist home to tourist home—in an effort to escape the police, who were looking for him on a grand larceny charge.[23] He, too, denied having sold narcotics on August 27, 1962,[24] but he, too, could remember nothing more specific.[25]

These lapses in memory, evidenced by both appellants and Officer Moore, undermine our confidence that the criminal process has produced the right defendants. The Government suggests that, in this case, our confidence should be bolstered by the existence of a corroborating witness, special agent Atria Harris.

Atria Harris is a former addict paid by the police to help undercover agents purchase narcotics. He began working with Officer Moore in August of 1962, and apparently he was with Moore throughout the latter's entire undercover period.[26] Harris participated in at least 102 cases during the seven months from August 1962 to March 1963.[27] He testified that he knew Hardy before August 27, 1962. They "did time in the penitentiary together." [28] At the trial he identified Hardy as one of the participants in the events of that night.[29]

In the circumstances in which this identification was made, though, it loses some of its significance. Harris does not seem to have taken any notes at the time of the crime.[30] He was with Hardy for less than fifteen minutes. And the transaction with Hardy was one of 101 similar transactions in which Harris participated. It is true that Harris knew Hardy from their old penitentiary days, but we do not know how extended or how long ago, that period was.[31] Apparently, Harris thought that his memory of August 27 was a bit shaky. On the morning of the trial he read from the notes Officer Moore had written.[32] We do not know whether Harris had any independent recollection of August 27 or whether his testimony was based entirely on Officer Moore's notes. It is fair to say, though, that Harris' corroboration was supported to some extent by the very evidence he was supposed to corroborate.

With regard to the other appellant, Ferguson, Harris' testimony has no significance. Although Harris accompanied Officer Moore and Hardy to H Street, Northeast, he remained in the car while the two others met Ferguson fifty or sixty feet away.[33] Of the illegal sale itself, Harris claims to have seen only "talk and passage and movement." [34] He

---

20. Tr. 115.

21. Tr. 113–117.

22. M. 26.

23. M. 20–21.

24. M. 23.

25. M. 5, 26.

26. Tr. 61, 77.

27. Tr. 77.

28. Tr. 63.

29. Tr. 62.

30. Tr. 50, 86.

31. Harris was convicted of a narcotics offense on November 30, 1956. Tr. 61.

32. Tr. 45, 68.

33. Tr. 72, 76.

34. Tr. 71.

did not claim that he could, nor did he, in fact, identify Ferguson at the trial. Thus, Harris' testimony has questionable significance with regard to one appellant and none with regard to the other.[35]

Whatever confidence we might have drawn even from this limited corroboration is shattered by other facets of this case which indicate that the police took only scanty precautions to insure that they picked the right defendants. For example, it was a month or more after the crime before Officer Moore identified Hardy's picture. We do not know exactly when or how this identification occurred, since, apparently, no clear records were kept. We have no idea at all from the record when Ferguson's picture was identified. There seems to have been no attempt to observe these defendants after August 27 in order to form a clearer picture of who committed the crime on that night. Indeed, Officer Moore testified that observing these defendants after the first sale "wasn't of importance to me."[36] No attempt was made to purchase heroin from Hardy at a later date. Moore did claim that he made another purchase from Ferguson after August 27,[37] but there is nothing in the record which explains why the Government chose to charge Ferguson with the earlier crime rather than one which occurred closer in time to his arrest.

■ The most serious indication of carelessness, though, is the six week delay between the complaint and Hardy's arrest. The only justification for not arresting a defendant at the time of the offense is the need to keep undercover agents under cover. Once the agent comes into the open, as Officer Moore did on March 15, 1963, that justification disappears. Delay after this point continues to hurt the defendant without aiding in enforcement of the narcotics laws. Under these circumstances the police must act with dispatch to arrest the defendant and inform him of the charges as soon as possible after the complaint is signed.

According to Hardy, he was, in fact, arrested about the time the complaint was signed in the instant case. However, he was not arrested on that complaint but instead was picked up for possession of a hypodermic needle, an eyedropper, and a cooker.[38] He was brought to Precinct No. 2. The arresting officer asked him whether he wanted to "make a buy."[39] When Hardy agreed, he was taken to the Narcotics Squad Office where Officer Didone offered to dismiss the charges if Hardy bought narcotics from one Melvin Sutton. Hardy was given nine dollars, signed a receipt, and was taken to Sutton's house, but Sutton was not in. Hardy made several unsuccessful attempts to find Sutton. During this period of semi-employment, Hardy was picked up and released by Detectives Bonaparte and Hutchinson. He had been to the Narcotics Squad Office three times on his own and was

---

35. Harris' corroboration has not been fully explored in any prior case. The Government concedes that the significance of Harris' testimony was not considered by the *Hardy* court except in a very different context. Appellee's Supplemental Memorandum. The court in *Ross* discussed the corroboration as follows: "*Hardy* did not involve the wholly uncorroborated testimony of an undercover policeman; a paid police informer, who claimed to have been an eyewitness to the sale, testified in support of the Government." 121 U.S.App.D.C. at 238, n. 4, 349 F.2d at 215, n. 4. This statement is true as far as it goes. Officer Moore's testimony was not *wholly* uncorroborated. However, the record shows that Harris did not corroborate Moore's identification of Ferguson, and it is the identification of the right defendant which is our major concern in these cases. Further, the record indicates that Harris' identification of Hardy may have been based on the same notes that Moore's testimony was based on. If so, Harris' testimony was a repetition of Officer Moore's identification, not a corroboration.

36. M. 48.

37. M. 41–42. There is ambiguity here. Tr. 48.

38. M. 8.

39. M. 13.

brought there twice.[40] Subsequently, on April 25, Hardy was arrested on the charges involved here which had been pending since March 15.

The Government rebutted this story only indirectly. Officer Moore testified that he was not informed that Hardy had been talking to Officers Didone or Paul.[41] And Officer Fogle, Moore's supervisor, testified that he never received "any knowledge that Officer Diodone or Officer Paul or any other officer of the Metropolitan Police Department had ever talked to [Hardy] hoping to use him as an informer, as a buyer." [42] None of the officers whom Hardy identified testified.

Hardy's story seems incredible. But even if it were wholly imagined—even if Hardy were not so clearly available to the police—there remain disturbing questions about why it took six weeks to arrest him. Both Moore and Fogle testified that the police made a "diligent effort" to arrest Hardy.[43] Apparently, though, this effort was never directed specifically towards finding him but only towards finding all 102 defendants charged on March 15. So the questions remain. Was Hardy out of the jurisdiction, or in hiding? Did the police have his address or any information which might have led to him? Exactly what effort was made to find him? Diligent failure may be excusable, but negligence is not.

## II

■ The record outlined above indicates a violation of Ross v. United States, *supra*. There, we held that the indictment must be dismissed because there was "(1) a purposeful delay of seven months between offense and arrest, (2) a plausible claim of inability to recall or reconstruct the events of the day of the offense, and (3) a trial in which the case against appellant consists of the recollection of one witness refreshed by a notebook." [44] All three elements appear in our case. Here, the delay was seven months for one appellant and eight for the other. Their claim of inability to recall the events of August 27 was plausible and was buttressed by Officer Moore's similar inability to recall. The case against Ferguson consisted of the recollection of one witness refreshed by a notebook. The case against Hardy consisted of the recollection of two witnesses refreshed by the same notebook.

Our conclusion is supported by the cases which follow and interpret *Ross*. All of those cases which upheld the indictment were substantially different from this one. Most of them involved much shorter periods of delay and circumstances which convinced us that the police picked their defendant carefully and that the defendant was not prejudiced by the delay.[45] Far from convincing us about the care taken by the police or the lack of prejudice, the record in this case suggests that *Ross* would have been violated even if the period of delay had been substantially shorter and even if the corroboration of Hardy's identity had more significance. United States v. Godfrey, 243 F.Supp. 830 (D.C.D.C.1965) (Youngdahl, D. J.), aff'd, 123 U.S.App. D.C. 219, 358 F.2d 850 (1966), Woody v. United States, 125 U.S.App.D.C. 192, 370 F.2d 214 (1966). *Cf.* Lee v. United

---

40. M. 8–16.

41. M. 35.

42. M. 53.

43. M. 53, 34.

44. 121 U.S.App.D.C. at 238, 349 F.2d at 215.

45. See, *e.g.*, Morrison v. United States, 124 U.S.App.D.C. 330, 365 F.2d 521 (1966), Daniels v. United States, 123 U.S.App. D.C. 127, 357 F.2d 587 (1966), Roy v. United States, 123 U.S.App.D.C. 32, 356 F.2d 785 (1965), Worthy v. United States, 122 U.S.App.D.C. 242, 352 F.2d 718 (1965), Powell v. United States, 122 U.S.App.D.C. 229, 352 F.2d 705 (1965), Jackson v. United States, 122 U.S.App. D.C. 124, 351 F.2d 821 (1965), Cannady v. United States, 122 U.S.App.D.C. 120, 351 F.2d 817 (1965), Mackey v. United States, 122 U.S.App.D.C. 97, 351 F.2d 794 (1965), Bey v. United States, 121 U.S.App.D.C. 337, 350 F.2d 467 (1965).

States, 125 U.S.App.D.C. 126, 127, 368 F.2d 834, 835–836, n. 2 (1966).[46]

## III

There is no doubt, then, that we would grant relief if appellants were here on direct appeal from their conviction. But they are not. Hardy and Ferguson were convicted on August 19, 1963. They appealed, raised the issue of delay, and lost in this court on August 4, 1964. Hardy v. United States, *supra*. Their petition for rehearing was denied on December 18, 1964. And on April 26, 1965, the Supreme Court denied a writ of certiorari. 380 U.S. 984, 85 S.Ct. 1353. Just two months later, this court dismissed Ross' indictment on substantially the same facts presented by Hardy and Ferguson.

Our appellants pose the compelling question, why should they be in jail while Ross, who presented the same case, is free? One answer, of course, is that rules of finality always create inequalities like this one. And unless these appellants can attack their conviction collaterally, they must be the unfortunate, but legitimate, victims of those rules.

In order to prevail now, these appellants must show (1) that their claim is cognizable on collateral attack, (2) that Ross v. United States, *supra,* applies retroactively, and (3) that their previous failure in this court does not bar them from collateral relief.

1. There is some reason to believe that any constitutional claim is cognizable on collateral attack. Fay v. Noia, 372 U.S. 391, 409, 83 S.Ct. 822, 9 L.Ed.2d 837 (1963), Sanders v. United States, 373 U.S. 1, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963).[47] This court has recently said that this is the general rule, but we held that in some circumstances even constitutional claims could not be raised collaterally. Thornton v. United States, 125 U.S.App.D.C. 114, 117, 368 F.2d 822, 825–826 (1966). *Thornton* outlined, in some detail, the relevant criteria which would militate against collateral review. These are mainly considerations of judicial administration.

[I]t becomes appropriate to consider the substantial disadvantages of collateral review in terms of judicial administration. First in time there is

---

46. Our colleague thinks that the conclusion reached by Judge Fahy and myself is a "second-guessing of a jury." This is essentially the same objection which this court rejected in *Ross*. Any dissatisfaction with *Ross* should be directed towards a reconsideration of that case and not at judges who accept its conclusions and methodology.

47. *Ross* was ambiguous about its constitutional underpinning. The case was characterized as "presenting a question akin to a Fifth Amendment due process issue." 121 U.S.App.D.C. at 234, 349 F.2d at 211. The court said "[T]he Constitution contemplates a separate interest in fair procedures for the citizen faced with the loss of his liberty by reason of criminal charges." 121 U.S.App. D.C. at 236, 349 F.2d at 213. Later in the opinion the court spoke in terms of "our supervisory responsibility." 121 U.S.App.D.C. at 239, 349 F.2d at 216. See also Powell v. United States, 122 U.S.App.D.C. at 232, 352 F.2d at 708, for the same ambiguity. Subsequently, however, one of the authors of the *Ross* opinion characterized that case solely in terms of a "due process claim of prejudice."

Woody v. United States, 125 U.S.App. D.C. at 196, 370 F.2d at 218 (McGowan, J., concurring). See also Mann v. United States, 113 U.S.App.D.C. 27, 29–30, n. 4, 304 F.2d 394, 396–397, n. 4 (1962), and United States v. Parrott, D.C., 248 F. Supp. 196, 202 (1965) for similar characterizations. Although there may be disagreement about specific cases, all seem to agree that "due process may be denied when a formal charge is delayed for an unreasonable oppressive and unjustifiable time after the offense to the prejudice of the accused * * *." Nickens v. United States, 116 U.S.App.D.C. 338, 340, n. 2, 323 F.2d 808, 810, n. 2 (1963).

It may be that some periods of delay violate the Constitution and others merely present issues "akin" to constitutional issues requiring the exercise of our supervisory powers. It is not important to decide which is involved here. By its terms, § 2255 is not limited to constitutional claims. Even if these claims are not constitutional, they are certainly very similar to or "akin" to constitutional claims, and therefore they are cognizable on collateral attack if they meet the criteria for collateral reviewability discussed *infra.*

the reasonable anticipation of a larger number of hearings on petitions that will prove to be insubstantial in fact. We would resolutely breast a flood of frivolity to rescue the stray meritorious claim if that were needed for effective vindication of constitutional protection, and there were no comprehensive procedure available at and before trial. * * * Here as already observed that effort is not required to vindicate the rights involved, and on the contrary this use of the courts would defer other cases that do present substantial claims and calls on judicial time. 125 U.S.App.D.C. at 118, 368 F.2d at 826–827.

Here, too, there are procedures available for raising the issue of delay at or before trial.

Second is the difficulty of belated determinations. The ascertainment of what constituted "probable cause," typically a subtle and indeed elusive question, is made incomparably more difficult and often artificial as recollections dim and witnesses are unavailable. 125 U.S.App.D.C. at 119, 368 F.2d at 827.

In our case, too, there are elusive questions which may become more difficult on collateral review. However, at least some of the basic facts relevant under Ross are, or should be, simple matters of record—for example, the period of delay between offense and complaint, complaint and arrest, arrest and trial, whether there was a corroborating witness, what his testimony was, how experienced the officer was before the offense, what his procedures were, when and how the defendant's picture was identified, whether the defendant was married, or employed, and so forth.

Last but by no means least is the fact that the court can take timely corrective action without jettisoning the trial if a valid search and seizure claim is presented at or before trial. But if the claim were entertained on collateral

attack it would not only scrap the completed trial but also, taking into account the possible subsequent unavailability of witnesses present or available at the original trial, might well imperil the public interest in securing a just conviction. 125 U.S.App.D.C. at 119, 368 F.2d at 827.

This consideration does not apply to our case, since a defendant who wins his point under Ross must have his indictment dismissed. There can be no "timely corrective action without jettisoning the trial * * *."

Although our case is different from Thornton in the ways stated above, these differences may not be relied upon as the sole grounds for distinguishing the cases because Thornton was not based solely on considerations of efficiency.

Courts should be reluctant to let general considerations of administration require injustice in the particular case. That reluctance is overcome by the weighty consideration, diluting the fear of particular injustice, that the claim of unreasonable search and seizure does not weaken the probative value of the evidence against the accused. * * * [C]ourts will not pursue ad infinitum the objective of deterring a blundering constabulary * * *. 125 U.S.App.D.C. at 119, 368 F.2d at 827–828.

In this regard our case is completely different. Ross is not concerned primarily with establishing some ideal of civilized police conduct—with "deterring a blundering constabulary." We are concerned that the law enforcement methods used here create too great a danger of convicting innocent people.[48] Since the "general considerations of administration" are less significant here, and since these cases present the real possibility that "particular injustice" may have been done, the issue of delay should be cognizable under 28 U.S.C. § 2255.

48. Ross v. United States, 121 U.S.App. D.C. at 236–238, 349 F.2d at 213–215, Woody v. United States, 125 U.S.App. D.C. at 194–196, 370 F.2d at 216, 218,

Cannady v. United States, 122 U.S.App. D.C. at 121, 351 F.2d at 818, Salley v. United States, 122 U.S.App.D.C. 359, 360–361, 353 F.2d 897, 898–899 (1965).

2. In Linkletter v. Walker, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965), Tehan v. United States ex rel. Shott, 382 U.S. 406, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966), and Johnson v. State of New Jersey, 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 822 (1966), the Supreme Court suggested guidelines for deciding when a decision should be applied prospectively only. The standard seems to be that decisions bearing upon the fairness of the trial or upon the reliability of the fact-finding process will be applied retroactively. Decisions dealing with other values might be applied prospectively. In *Linkletter* the Court distinguished Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), from other cases which had already been applied retroactively.

> [I]n each of the three areas in which we have applied our rule retrospectively the principle that we applied went to the fairness of the trial—the very integrity of the fact-finding process. Here, as we have pointed out, the fairness of the trial is not under attack. All that petitioner attacks is the admissibility of evidence, the reliability and relevancy of which is not questioned and which may well have had no effect on the outcome. 381 U.S. at 639, 85 S.Ct. at 1743.

In *Shott,* too, the Court distinguished recent decisions which were applied retroactively.

> [W]e deal here with a doctrine which rests on considerations of quite a different order from those underlying

other recent constitutional decisions which have been applied retroactively. The basic purpose of a trial is the determination of truth, and it is self-evident that to deny a lawyer's help through the technical intricacies of a criminal trial or to deny a full opportunity to appeal a conviction because the accused is poor is to impede that purpose and to infect a criminal proceeding with the clear danger of convicting the innocent. [Cases omitted.] The same can surely be said of the wrongful use of a coerced confession. [Cases omitted.] By contrast, the Fifth Amendment's privilege against self-incrimination is not an adjunct to the ascertainment of truth. 382 U.S. at 416, 86 S.Ct. at 465.

In *Johnson,* the Court cited this reasoning with approval.

> In each instance we concluded that retroactive application was justified because the rule affected "the very integrity of the fact-finding process" and averted "the clear danger of convicting the innocent." [Citing *Linkletter* and *Shott.*] 384 U.S. at 727–728, 86 S.Ct. at 1778.

The doctrine in *Ross* was announced because we questioned the reliability of the process by which the defendant was identified. Also, we thought that the defendant was not given a fair chance to defend himself. In short, we feared that innocent people could be convicted too easily. Therefore, the doctrine should be applied retroactively.[49]

---

49. There are other differences as well between our case and the three recent Supreme Court cases. (1) *Ross* is not a very broad decision. At least so far it has been applied only to some defendants convicted of one special kind of crime. Retroactive application would not be as disruptive as the Supreme Court envisioned in its cases. Compare Tehan v. United States ex rel. Shott, 382 U.S. at 418–419, 86 S.Ct. 459 and Johnson v. State of New Jersey, 384 U.S. at 731–732, 86 S.Ct. 1772. (2) Although there had been cases before *Ross* which might be decided differently now, *Ross* did not overrule a long line of established precedent. Compare Linkletter v. Walker, 381

U.S. at 636, 85 S.Ct. at 1741, where the Court spoke of "thousands of cases that were finally decided on *Wolf,*" Tehan v. United States ex rel. Shott, 382 U.S. at 417, 86 S.Ct. 459, where the Court spoke of the 56 year period in which the States were told consistently that Twining v. State of New Jersey, 211 U.S. 78, 29 S.Ct. 14, 53 L.Ed. 97 (1908), was still good law, and Johnson v. State of New Jersey, 384 U.S. at 731, 86 S.Ct. 1772. Nickens v. United States, *supra,* which is the case seemingly most inconsistent with *Ross,* was decided after the offense and the trial in the instant case so that the Government cannot claim justifiable reliance upon that decision.

3. Hardy and Ferguson raised the issue of delay on direct appeal and lost. The usual rules of *res judicata* would prevent these appellants from raising the same issue again.[50] However, in Sanders v. United States, *supra,* the Supreme Court held that *res judicata* does not apply to motions under § 2255. "The inapplicability of *res judicata* to habeas * * * is inherent in the very role and function of the writ."[51] Therefore, said the Court, even if a claim has been raised before, "the applicant may be entitled to a new hearing upon showing an intervening change in the law * * *."[52] Since *Ross* intervened between these appellants' original appeal and their motion under § 2255, and since *Ross* significantly changed the law in this area, it would seem quite clear that *Sanders* entitles these appellants to a new hearing on their claim.

The Government suggests, though it does not discuss, distinctions between *Sanders* and this case. *Sanders* dealt with relitigation in successive motions under § 2255. Our case deals with relitigation after an adverse decision on direct appeal from the conviction. However, the Court emphatically stated that the ordinary rules of finality do not apply in § 2255 proceedings. Ordinarily those rules, and the policies they implement, would apply equally to the first § 2255 motion (after an adverse determination at trial and direct appeal) as they would to the second § 2255 motion (after an adverse determination at a prior § 2255 hearing and appeal). The Supreme Court's rejection of *res judicata* applies equally to both situations. Recently, the District Court for the District of Columbia adopted this interpretation of *Sanders.*

"There appears to be no reason in principle to distinguish between the finality effect of determination of grounds made at trial or on appeal and determinations made on earlier § 2255 applications * * *." Heard v. United States, 263 F.Supp. 613, 615 (1967).[53]

If the Government's distinction makes any difference at all, it supports this conclusion. Section 2255 provides that "The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." Yet, in spite of the statute's language, in *Sanders* the Supreme Court was willing to allow successive motions in some circumstances. Our appellants face no such statutory prohibition because this is their first motion under § 2255. Therefore, the Supreme Court's reasoning would apply with even greater force to them.

The Government suggests also that the Court's statement, quoted at note 52, *supra,* applies only when the parties have *failed* to raise the issue previously. Here, the appellants did raise the issue of delay on direct appeal. Therefore, the Government suggests, *Sanders* does not control this case.

The Government's suggestion has no merit. First, the statement appears in a section of *Sanders* titled "Successive Motions on Grounds *Previously Heard and Determined.*"[54] Second, the statement appears in a paragraph the topic sentence of which is "*Even if the same ground was rejected on the merits on a prior application,* it is open to the applicant to show that the ends of justice would be served by permitting the rede-

---

50. Lampe v. United States, 110 U.S.App. D.C. 69, 288 F.2d 881 (1961), McGuinn v. United States, 99 U.S.App.D.C. 286, 239 F.2d 449 (1956).

51. 373 U.S. at 8, 83 S.Ct. at 1073.

52. 373 U.S. at 17, 83 S.Ct. at 1078.

53. The District Court quoted Judge Wright's dissent in Thornton v. United States, *supra.* The majority in *Thornton* did not disagree with Judge Wright on this point. See also AMERICAN BAR ASSOCIATION PROJECT ON MINIMUM STANDARDS FOR CRIMINAL JUSTICE, POST-CONVICTION REMEDIES (Tentative Draft, January 1967), § 6.1(a).

54. 373 U.S. at 15, 83 S.Ct. at 1077. (Emphasis added.)

termination of the ground."[55] Third, the concluding sentence of that paragraph reads, "[T]he burden is on the applicant to show that although the ground of the new application *was determined against him on the merits on a prior application,* the ends of justice would be served by a redetermination of the ground."[56] It is clear that when the Court made the statement about relitigation it was talking about situations in which the party had raised the issue once before and lost and not about situations in which the party failed to raise the issue previously.[57]

### IV

Since I think *Ross* should be applied to this case, I would grant relief in this proceeding. However, I would not direct the dismissal of these indictments. This case was tried before *Ross* was decided, and, therefore, the Government was not alerted that it would have to meet the appellants' contentions. Also, at the trial, when the Government attempted to answer some of these contentions, the District Judge properly excluded the evidence as too prejudicial. There are still questions which remain open, for example, whether Harris' testimony was based upon Officer Moore's notes,[58] whether the police made diligent efforts to arrest Hardy, and whether the police sufficiently guarded against faulty identification during Moore's undercover period, particularly with regard to these appellants. Therefore, I would remand this case so that the parties could have a fuller opportunity to present evidence on the issue of delay.

**55.** 373 U.S. at 16, 83 S.Ct. at 1078. (Emphasis added.)

**56.** 373 U.S. at 17, 83 S.Ct. at 1078. (Emphasis added.)

**57.** The particular words used by the Court in this section of its opinion should be noted carefully. The Court said, "If purely legal questions are involved, the applicant may be entitled to a new hearing upon showing an intervening change in the law or some other justification for having failed to raise a crucial *point* or *argument* in the prior application." 373 U.S. at 17, 83 S.Ct. at 1078 (emphasis added). The section of the opinion deals with successive motions on *grounds* previously heard and determined. The Court defined a "ground" to mean "a sufficient legal basis for granting the relief sought by the applicant. * * * In other words * * * identical *grounds* may often be supported by different legal *arguments*". 373 U.S. at 16, 83 S.Ct. at 1077 (emphasis added). Thus, the statement seems to assume that the "ground" for decision was previously raised and determined, but that the parties failed to raise a crucial "argument" in the prior application. This failure, reasoned the Court, may be justified if there has been an intervening change in law since the "argument" may not have been available at the time of the previous application. The Court's statement, then, fits our case exactly. In the first appeal, the "ground" for decision, *i.e.,* the delay, was heard and determined, but the "argument" based on *Ross* was not raised because that case had not yet been decided.

Supposing, however, that appellants did raise the same "argument" as well as the same "ground" previously, the Court's reasoning in *Sanders* would allow them to relitigate the old "argument" as well as the old "ground" if there has been an intervening change in law.

**58.** If it turns out that Harris' testimony was actually independent of Moore's, then I think we would have to decide whether the other facets of this case require dismissal of Hardy's indictment in spite of the corroboration.