219 So.2d 410

**Ardell HARRIS**

v.

**STATE.**

**I Div. 279.**

Court of Appeals of Alabama.

Feb. 18, 1969.

Irving Silver, Mobile, for appellant.

MacDonald Gallion, Atty. Gen., and Walter S. Turner, Asst. Atty. Gen., for the State.

CATES, Judge.

Harris was convicted of robbery. The jury set his punishment at twelve years imprisonment. This was the second trial on the instant indictment. Harris v. State, 280 Ala. 468, 195 So.2d 521.

I.

The trial began June 13, 1967. Mrs. Ida Hannon, the victim, ran a grocery store with her husband in Prichard.

April 6, 1965, Mrs. Hannon was tending store while her husband went to lunch. The defendant and another man came in. They asked for "boloney."

Mrs. Hannon's examination in chief continued:

"Q All right, then what did they do?

"A Well, I went behind the meat case and got the boloney, and I asked them, 'What else', and they said that was all, and I came out from behind the meat case, and they were leaning over here against the vegetable bin, and I had to make a turn to get to my check-out counter, and he grabbed me, and it was the other one that hit me with the iron rod.

"Q You say this man held you and the other one hit you with an iron rod?

"A. Yes, and then I didn't see him any more, but this other one was the one that stood there, and I fell on the floor.

"Q How many times were you hit?

"A Oh, I don't know. I wasn't counting licks, I was screaming for help.

"Q To what extent were you injured?

"A Well, I'v got scars entrenched on my head and this hand (indicating). Whenever he would start down with that iron rod, I'd throw my hands over my head, and you can see how crooked it is. It broke my bones, and even a piece of one is gone out of this one (indicating further).

"Q All right, and then what happened after they beat you with the rod?

"A Well, they left, and I got up. My little grandbaby never did come out from behind the meat case. We had a big old fan there, and she just peeped through the cracks and I got up, and we had towels, and I got one of them and laid it across my head, and went up and was going to get the telephone to call my husband. I got the telephone out from under the counter and couldn't see to dial. I had lost my glasses during the round, so Clayton Kelley and two or three more boys came in and asked me if I wanted them to call, so Clayton Kelley called my husband and called the police.

\*      \*      \*      \*      \*      \*

"Q Now, when did you next see the Defendant after that day, if you did see him?

"A Well, it was close to four months.

"Q Where did you see the Defendant?

"A In Prichard at the jailhouse.

"Q Did you see him in the company with any other people? Were there others with him, or where did you see him in the Prichard jail?

"A At the courthouse in the line-up. They called me to come, and—

"Q How many people were in the line-up?

"A Seven.

"Q Do you recall which number this Defendant was?

"A Not exactly. I know it was three and five which were the two numbers I picked.

"Q You don't recall specifically?

"A Not specifically.

"Q You say you named two people. Now, which were the two? Was this boy one of them?

"A He was one of them.

"Q All right, who was the other one?

"A Jerry Harris.

"Q Was he also in the store that day?

"A He was.

"Q Was he the one that hit you?

"A He was.

"Q Now, after these boys left, did you discover anything missing from your store?

"A: Well, the bills out of the cash register. It was open, and the bills was gone out of the cash register. They didn't bother the change. Then we had a check, and it was laying on the floor, and I stooped down and picked it up and laid it on the counter, and I got blood on it, blood was just streaming.

"Q From your head?

"A On my head and all.

"Q How much money was missing?

"A Well, it was around forty or forty-five dollars, something like that.

"Q In lawful currency of the United States of America?

"A Yes, sir.

"Q Now, this money that you are speaking of, this forty or forty-five dollars, it was there before any of them came, and was gone when they left, is that right?

"A That's right."

Frances Chapman who lived near the Hannons' grocery heard Mrs. Hannon's cries for help. Peeping in the store she saw Mrs. Hannon "red as a flannel." She ran and phoned the police.

This witness saw "two boys" but did not observe them long enough to identify them.

J. R. Rigsby, detective with the City of Prichard, was present when Mrs. Hannon picked Harris (and the other indictee) out in a line-up of five men. No one prompted Mrs. Hannon. Rigsby did not know of her attending any prior line-up about the instant crime.

For the defense, Jerry Lee Shaw, a convict from Atmore Prison, testified that he was one of the two robbers. He stated that one James Williams, not Harris, was his accomplice. He did not know of Williams's whereabouts at the time of trial.

On cross Shaw admitted that on his own trial he had then denied having anything to do with the robbery.

## II.

The line-up occurred in 1965. We see nothing to show it was unfairly conducted.

■ The rule of exclusion promulgated in United States v. Wade, 368 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149, and Gilbert v. California, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178, is not retroactive.

■ This trial began June 13, 1967. *Wade* and *Gilbert,* supra, were handed down the day before. However, the date of the line-up, not of trial, is the demarkation between exclusion and admissibility.

In the companion case of June 12, 1967, the Supreme Court said:

"* * * We hold that *Wade* and *Gilbert* affect only those cases [i. e., Wade's and Gilbert's] and all future cases which involve confrontations * * * *conducted* in the absence of counsel *after this date.* * * * [That is, after June 12, 1967.]" (Italics added.) Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199.

See also People v. Feggans, 67 Cal.2d 444, 62 Cal.Rptr. 419, 432 P.2d 21.

## III.

■ On the day set for this second trial, defendant moved:

"* * * that the prosecution of this case be dismissed on the grounds that the defendant was denied due process of law in that he was arrested, as shown by the record, an unreasonable amount of time after the offense was committed thereby causing him great prejudice in the preparation of the defense of his case."

The minute entry omits any reference to evidence being· taken or tendered in support thereof. Accordingly, we assume defendant was relying solely on the averment, "as shown by the record."

However, in this record, the time between the offense and initial arrest is not shown. We cannot accept a passage of time before a prisoner's apprehension, per se alone and unaided, as proof that the prosecution—like a cat playing with a mouse—is leaving the suspect at large to lull him into a false (and hence in some obscure way prejudicial) sense of security that his crime has gone undetected.

Moreover, the State's brief has a valid point:

"The natural consequence of this argument would be if a criminal can hide out long enough and avoid arrest then he should not be prosecuted because he would be prejudiced in preparing an adequate defense. * * *"

The appellant in brief had argued as follows:

"Error was also committed by the court in overruling defendant's motion to dismiss the prosecution on the grounds that more than an unreasonable period of time elapsed from the time of the alleged offense and his arrest. Great prejudice inevitably inured to the defendant in the preparation of an adequate defense to this case. Woody v. United States, [125 U.S.App.D.C. 192], 370 F.2d 214 (D.C. Cir., 1966). See also, Note, 80 Harv.L. Rev. 1361 (1967)."

We hold that the *Woody* case, supra, even if it were [1] controlling in Alabama, is abstract so far as this case is concerned. There is no constitutional right to be arrested. Hoffa v. United States, 385 U.S. 293, 310, 87 S.Ct. 408, 17 L.Ed.2d 374.

## IV.

The defense requested in writing the following charge 8:

"I charge you that the indictment in this case also embraces the offense of grand larceny."

In Autrey v. State, 15 Ala.App. 574, 74 So. 397, we find:

"The court properly charged the jury that under the indictment for robbery a conviction could be had for larceny. Each of the lesser offenses of assault with intent to rob, assault, and battery, simple assault, or larceny are included in the greater offense. Rambo v. State, 134 Ala. 71, 32 So. 650; Smith v. State, 11 Ala.App. 153, 65 So. 693."

We quote also from Howard v. State, 41 Ala.App. 360, 132 So.2d 384:

"While these charges fail to define the offense and are not based on a consideration of the evidence, nevertheless stare decisis compels us to consider them as correct in form. Judge Carr quoted the Duncan charge illustratively in Carter v. State, 31 Ala.App. 526, 19 So.2d 361. The formula, 'a charge of assault with intent to murder includes a charge of assault and battery,' was approved in Stovall v. State, 34 Ala.App. 610, 612, 42 So.2d 636. See Kelly v. State, 235 Ala. 5, 176 So. 807."

In the *Autrey* case there was a dispute in the evidence. The jury could have believed Autrey's testimony that he did not have a pistol and at the same time have believed his victim Smith's testimony in part; that is, that Autrey took and carried away Smith's four silver dollars.

Here, Harris's defense was he was never at Hannon's grocery. Mrs. Hannon's testimony was undisputed and supported assault and battery motivated by grand larceny. The two coalesced into a complete and indivisible act of robbery.

We do not see how any reasonable jury could have believed Mrs. Hannon when she said she was held and bludgeoned and at the same time doubted her when she said $45.00 was taken from the cash register. Although Kelly v. State, 235 Ala. 5, 176 So. 807, is not altogether clear, we

1. We pointedly use the subjunctive.

consider that, seen dimly as through a glass, it supports the trial judge's refusal of charge 8. See Cooper v. State, 277 Ala. 200, 168 So.2d 231.

The judgment below is due to be

Affirmed.